# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| PHOENIX LICENSING, L.L.C. ET AL., | § § § | |
| *Plaintiffs*, | § § | |
| | § | Case No. 2:13-CV-1081 |
| v. | § | LEAD CASE |
| | § | |
| AAA LIFE INSURANCE COMPANY | § § | |
| *Defendant*. | § | |
| | § § | |

## MEMORANDUM OPINION AND ORDER

On April 10, 2015, the Court held a hearing to determine the proper construction of the disputed claim terms in United States Patent Nos. 5,987,434 ("the '434 Patent"); 6,999,938 ("the '938 Patent"); 7,856,375 ("the '375 Patent"); 7,860,744 ("the '744 Patent"); 7,890,366 ("the '366 Patent"); 8,234,184 ("the '184 Patent"); 8,352,317 ("the '317 Patent"); 8,606,632 ("the '632 Patent"); 8,719,114 ("the '114 Patent"); and 8,738,435 ("the '435 Patent") (collectively, the "Asserted Patents"). After considering the arguments made by the parties at the hearing and in the parties' claim construction briefing (Dkt. Nos. 385, 411, & 419), the Court issues this Claim Construction Memorandum and Order.

# TABLE OF CONTENTS

MEMORANDUM OPINION AND ORDER ................................................................. 1

I.      BACKGROUND ............................................................................................ 3

        **A.      Overview of the Apparatus and Methods Disclosed in the Asserted Patents**  3

        **B.      Overview of the Asserted Patents** ................................................... 5

II.     APPLICABLE LAW ...................................................................................... 9

        **A.      Claim Construction** ...................................................................... 9

        B.      Means-Plus-Function Limitations ....................................................... 11

        **C.      Construction Indefiniteness** ......................................................... 12

III.    CONSTRUCTION OF AGREED TERMS ................................................... 13

IV.     CONSTRUCTION OF DISPUTED TERMS ................................................ 14

                1.      "automatic[ally]" ................................................................. 14
                2.      "financial product[s] [and/or] [financial] services" ................... 24
                3.      "financial" when used in the preamble ................................... 34
                4.      "products [or services]" ....................................................... 37
                5.      "offer[ing]" ...................................................................... 43
                6.      "plan" ............................................................................. 46
                7.      "variable information" ........................................................ 50
                8.      "each" ............................................................................ 55
                9.      "response" ....................................................................... 59
                10.     "means for inputting" ........................................................ 63
                11.     "means . . . for using" ....................................................... 73
                12.     "means for selecting the subset of life insurance products to include the life
                insurance products having the differing face value amounts" ............. 80
                13.     "means for selecting from among a plurality of consumer entities those"
                consumer entities suitable for receiving a particular type of financial product or
                service offering being offered as part of a mass marketing campaign" ............. 82
                14.     "means for automatically determining and gathering" ................ 86
                15.     "means for preparing" / "means for automatically generating" /"means for
                automatically preparing" / "means for automatically generating and
                communicating" ...................................................................... 91
                16.     "means for sending" / "means for communicating" / "means for delivering"
                100
                17.     "means for receiving" ....................................................... 105

V.      CONCLUSION ............................................................................................ 109

## I.    BACKGROUND

### A. Overview of the Apparatus and Methods Disclosed in the Asserted Patents

The Asserted Patents generally relate to an apparatus and method for marketing financial products such as individual insurance policies. '434 Patent at 1:7–9. More specifically, the specification states that the Asserted Patents relate "to apparatus and methods for marketing such products in a fully automated or significantly automated manner to achieve high volumes of transactions and sales in a short period of time." *Id.* at 1:9–12. In describing the prior art, the specification states that known automated systems were "limited largely if not entirely to one of two major types (term of [sic] permanent) of product, i.e., term life insurance," and lacked the ability to select alternative financial products. *Id.* at 2:65–3:4. The specification continues that the known systems "typically require the attention of and interaction with the agent or telemarketer to gather and input the lead client information, and to aid in the selection of the most advantageous products for presentation to the client." *Id.* at 3:4–8. The specification also states that "[a]nother important drawback of such known systems is the limited extent to which they personalize the presentation letter or other communications." *Id.* at 3:9–11.

The specification further characterizes the prior art systems as being "limited in their ability to process large volumes of prospective client communications." *Id.* at 3:21–23. The specification states that "[t]his is attributable in large part to their requirement for human input and decision making as a necessary part of their operation, and because of the relatively unsophisticated nature of the known systems." *Id.* at 3:23–26. The specification concludes the description of the prior art by stating that "[a]ll of these methods and systems have been limited in that they require a substantial amount of human involvement." *Id.* at 3:28–30.

With this background, the specification states that the object of the invention is to provide an apparatus and method for transacting financial product marketing and sales that is: (1)

capable of being highly automated; (2) capable of processing relatively large volumes of client communications efficiently; (3) relatively cost effective compared to prior approaches; and (4) more personalized and individualized to individual prospective clients relative to prior approaches. To accomplish these objectives, the specification discloses the apparatus illustrated in Figure 1.



'434 Patent at Figure 1. In describing Figure 1, the specification states that this "embodiment comprises a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations." *Id.* at 6:2–5. The specification adds that "each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse 22, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24." *Id.* at 6:10–14. The specification further states that "[t]he processor of each computer node (server or workstation) includes a central processing unit (CPU) 26, random access memory (RAM) 28, and at least one mass storage device 30." *Id.* at 6:15–18.

In further describing processor 12, the specification states that the processor "has resident within its memory system computer software," which "has a 'core' system for transacting financial product marketing, and an 'administrative and support' system for supporting the core

system, facilitating the marketing program, providing administrative and management reports and functions, and preferring other tasks." *Id.* at 7:14–22. The specification states that "[t]he core system includes a plurality of modules, including a data input module, a database module, a Virtual Agent™ module, and a sales presentation and output module." *Id.* at 7:22–25. The specification also describes that "[t]he administrative and support system includes a production and scheduling module, a sales and financial report and analysis module, a telemarketing module, a communications interface module, and an automated agency and new business processing module." *Id.* at 7:25–29. The specific systems and modules will be discussed in more detail below as they relate to a disputed term/phrase.

### B. Overview of the Asserted Patents

Plaintiffs brings suit alleging infringement of ten out of fifteen patents in a related family. The following figure provides an overview of the patent family.



As illustrated above, the '434 Patent is the parent of the family, with several of the Asserted

Patents relating to the '434 Patent through continuation-in-parts and continuations. All of the Asserted Patents claim priority to the '434 Patent filing date. The following chart lists the filing date and issue date for each patent in the family.

| Patent No. | Date Filed | Date Issued |
|:---:|:---:|:---:|
| '434 Patent | 6/10/1996 | 11/16/1999 |
| '938 Patent | 7/16/1999 | 2/14/2006 |
| '184 Patent | 7/15/2005 | 7/31/2012 |
| '366 Patent | 12/22/2006 | 2/15/2011 |
| '375 Patent | 12/29/2006 | 12/21/2010 |
| '744 Patent | 4/27/2007 | 12/28/2010 |
| '632 Patent | 8/9/2010 | 12/10/2013 |
| '317 Patent | 4/6/2012 | 1/8/2013 |
| '114 Patent | 7/27/2012 | 5/6/2014 |
| '435 Patent | 12/9/2013 | 5/27/2014 |

Turning first to the '434 Patent, it is titled "Apparatus and Method for Transacting Marketing and Sales of Financial Products." The Abstract of the '434 Patent states the following:

> An apparatus and method which use client information to automatically select and present financial products appropriate for the client. The apparatus according to one aspect includes an input device for inputting client information, financial product information, ancillary data, and decision criteria; a storage device for storing the inputted items; decision making logic circuitry for using the inputted items to select a subset of the financial products; and an output device for preparing a client communication which identifies the subset of the financial products. The output device incorporates a portion of the client information and a portion of the financial products information into the client communication. The method according to one aspect includes inputting the same items; storing these inputted items; using the stored items to select a subset of the financial products; and preparing a client communication which identifies the subsets of the inputted information and incorporates it into the client communication.

'434 Patent at Abstract. Claim 22 is representative of the asserted claims of the '434 Patent and recites the following elements (disputed terms in italics):

> 22. An apparatus for using client information about clients to *automatically* select and present *financial products* appropriate for *each* of the clients, the apparatus comprising:

means for inputting the client information, information about the *financial products*, a plurality of *plans each* of which includes at least one of the *financial products*, and decision criteria pertaining to selection from among the *plans*; wherein said *means for inputting* the client information is adapted to automatically input the client information without human intervention between input of respective client records;

means operatively coupled to the inputting means for storing the client information, the *financial products* information, the *plans*, and the decision criteria;

means operatively coupled to the storing means for using the client information, the *financial products* information, the *plans* and the decision criteria to select a subset of the *plans* for *each* of the clients appropriate for that client, the subset of the *plans* including at least one *plan* comprising a plurality of the *financial products*; and

*means for preparing* a client communication for *each* of the clients which identifies the subset of the *plans* for that client.

The '744 Patent, the '317 Patent, the '366 Patent, the '632 Patent, the '435 Patent, and the '375 Patent generally share a common specification. Claim 28 of the '744 Patent is representative of the asserted claims and recites the following elements (disputed terms in italics):

28. A method for *automatically* providing personalized notices concerning one or more *financial products or services* over an electronic network, the method utilizing at least one processor comprising the steps of:

a) providing a first database containing *financial product or service* content associated with at least one *financial produc*t or service;

b) executing a first software routine via the processor coupled to said first database and configured to *automatically* and without human intervention prepare a first electronic communication for a plurality of clients suitable for transmission over an electronic network, said first electronic communication comprising information relating to an *offering* for said at least one *financial product or service*; said first electronic communication comprising in part at least instructions relating to a first electronic communication *response* option;

c) executing a second software routine by the processor configured to receive one or more variable electronic communication *responses*

from certain clients based on said certain clients selecting said at least one electronic communication *response* option;

d) providing a second database containing client information for said certain clients who are also existing clients, said client information including both client identification information and client account information for said at least one *financial product or service*;

e) generating *variable information* for said certain clients relating to said *financial product or service*, which *variable information* varies from one client to another client based on said one or more variable electronic communication *responses* received from at least one of said certain clients;

f) executing a third software routine by the processor coupled to said second database and configured to *automatically* and without human intervention prepare a second electronic communication for said certain clients suitable for transmission over said electronic network, said second electronic communication comprising a personalized notice concerning said at least one *financial product or service*; wherein said personalized notice includes at least both said *variable information* and said client identification information;

g) sending said first electronic communication by email through said electronic network to at least one of said certain clients.

The '938 Patent, the '184 Patent, and the '114 Patent generally share a common specification with the other Asserted Patents, but also include a system for automatically preparing customized replies in response to communications from a client. As an example, the Abstract of the '938 Patent states the following:

A system for automatically preparing customized replies in response to communications from a plurality of clients. To facilitate automation and tracking, each original communication to the client (or each original response from the client) is tagged with a unique label, and replies to client responses are each correspondingly labeled. The system provides individualized replies to each of a variety of response options that a client might exercise in response to a received communication, whether an original communication or a reply to a previous response. The system is applicable to mass marketing communications, and is particularly well suited to the generation of personalized replies to each and every one of a multitude (tens of thousands and up to millions) of communications from clients. The system is also capable of continuing to generate replies to follow-up responses from clients and to thereby maintain an ongoing "conversation" until the client makes a purchase decision, or no longer responds. Communications may be delivered through a variety of means, such as the internet, the mails, by facsimile, on a host communication, etc.

'938 Patent at Abstract. Claim 52 is a representative claim of the '938 Patent and recites the following elements (disputed terms in italics):

> 52. A method for *automatically* preparing customized communications for a plurality of consumer entities, and replying to *responses* from consumer entities with customized replies, the method comprising:
>> *automatically* preparing a mass marketing customized communication for *each* consumer entity, said communication comprising information relating to an *offering* for one or more *financial products or services* being offered as part of a mass marketing campaign;
>> delivering *each* communication to a respective one of the plurality of consumer entities; receiving one or more *responses* from at least some consumer entities, said *responses* comprising nonpurchase requests and being in *response* to communications;
>> *automatically* generating one or more replies for at least some of the *responses* or subsequent *responses*, *each* of said replies being generated prior to receipt from a consumer entity of a purchase commitment of said one or more *financial products or services* being offered as part of said mass marketing campaign, *each* reply customized for a consumer entity using other than one or more of name, address and account number of said consumer entity, and responsive to a nonpurchase request received from said consumer entity; and
>> delivering said replies to associated consumer entities.

## II.   APPLICABLE LAW

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388

F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id*. Other asserted or unasserted claims can also aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id*. Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*. The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of

disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc., v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent.").

Although extrinsic evidence can be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id*. Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id*.

### B. Means-Plus-Function Limitations

The asserted patents also contain means-plus-function limitations that require construction. Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35

U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.* A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## C.  Construction Indefiniteness

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112 ¶ 2. Whether a claim meets this definiteness requirement is a matter of law. *Young v. Lumenis, Inc.*, 492 F.3d 1336, 1344 (Fed. Cir. 2007). A party challenging the definiteness of a claim must show it is invalid by clear and convincing evidence. *Takeda Pharm. Co. v. Zydus Pharms. USA, Inc.*, 743 F.3d 1359, 1368 (Fed. Cir.2014). The ultimate issue is whether someone working in the relevant technical field could understand the bounds of a claim. *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010).

Specifically, "[a] patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014).

### III.    CONSTRUCTION OF AGREED TERMS

The parties have agreed to the construction of the following terms:

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "customized"<br><br>'434 Patent (109);<br>'938 Patent (1, 52, 184, 226);<br>'375 Patent (1, 8, 9, 12, 22, 24, 27, 37, 87, 93, 94, 97, 107, 109);<br>'366 Patent (60, 70) | "specifically tailored for a particular person, but not necessarily unique to the person" |
| "personalized"<br><br>'375 Patent (87);<br>'744 Patent (1, 9, 10, 17, 18, 28, 29);<br>'366 Patent (1, 11, 12, 17, 18, 21, 28, 39, 113);<br>'317 Patent (24, 51);<br>'435 Patent (1, 4, 10, 15, 16, 29, 30) | "specifically tailored for a particular person, but not necessarily unique to the person" |
| "decision criteria"<br>"decision information"<br><br>'434 Patent (2, 14, 21, 22, 41, 47, 48, 49);<br>'317 Patent (1, 9, 25, 52);<br>'632 Patent (1, 17);<br>'114 Patent (13, 25, 29) | "instructions that enable the CPU to select from among the financial products" |
| "reply"<br>"replies"<br><br>'938 Patent (1, 18, 52, 184, 192, 201, 218, 220, 226, 241, 258, 260);<br>'375 Patent (22, 24, 107, 109);<br>'366 Patent (17, 18);<br>'435 Patent (9, 10, 26) | "responsive communication(s) that respond(s) to a response from a client" |

Dkt. No. 317 (Joint Claim Construction and Prehearing Statement). In view of the parties' agreements on the proper construction of each of the identified terms, the Court hereby adopts the parties' agreed constructions.

## IV.    CONSTRUCTION OF DISPUTED TERMS

The parties' dispute focuses on the meaning and scope of seventeen terms/phrases in the Asserted Patents.

### 1.  "automatic[ally]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "automatic[ally]" | plain meaning, or, alternatively, "performed by a computer" | performed by a computer without manual input<br><br>When used in the preamble or when used in the body of claims introducing a series of steps: "automatic[ally]" is limiting, and each recited step is part of one aggregated and continuous process performed by a computer without manual input. |

#### a)  The Parties' Positions

The parties agree that the term "automatic[ally]" must be "performed by a computer." The parties dispute: (1) whether the term is limiting when it appears in the preamble; and (2) whether the term "automatic[ally]" must be "one aggregated and continuous process performed by a computer without manual input," as Defendants propose. Plaintiffs contend that the intrinsic evidence indicates that some human intervention is within the scope of "automatic." (Dkt. No. 385 at 11) (citing '434 Patent at 4:1–2; '938 Patent at 15:32–33, 28:44–45). Plaintiffs also argue that Figure 4 of the '434 Patent expressly identifies an embodiment where "manual input" is part of the process of "automatically inputting . . . client information . . . ." (Dkt. No. 385 at 11) (citing '434 Patent at 7:35–36, 20:42–47, 20:63–21:2, Figure 4). Plaintiffs further argue that

when the patentee intended for "automatic[ally]" to be without human involvement, he claimed so expressly. (Dkt. No. 385 at 11) (citing '434 Patent at claim 1 and 84). According to Plaintiffs, Defendants either inject a "without manual input" limitation where none is claimed, or render the claims unintelligible. (Dkt. No. 385 at 12.)

Defendants respond that the term "automatically" appears primarily in three contexts in the asserted claims. (Dkt. No. 411 at 11.) Defendants contend that the first context is illustrated in the '434 Patent, the '375 Patent, the '744 Patent, the '938 Patent, and the '184 Patent with the term "automatically" appearing in the preamble. (*Id.*) Defendants argue that the second context is illustrated in the '317 Patent, the '632 Patent, and the '435 Patent with the term "automatically" appearing as part of a phrase within the body of the claim that introduces a series of steps. (*Id.*) Defendants argue that the prosecution history indicates that this language requires each step following the language to be "part of one aggregated and continuous process." (*Id.* at 12.) Defendants further argue that in the third context, the term "automatically" modifies a single step. (*Id.*)

Regarding their proposal of "one aggregated and continuous process," Defendants argue that this language is taken from purported disclaimer statements made in the reexamination of the '434 Patent. (Dkt. No. 411 at 12.) Defendants contend that the applicant repeatedly stated that the prior art "simply does not teach automatic selection and preparation of client communications," because the prior art did not teach "preparing communications as part of one process." (Dkt. No. 411 at 12) (quoting Dkt. No. 411-1 at 12, 21, 26 ('434 Patent 2nd Reexam FH, Aug. 18, 2008, Response)). Defendants argue that the identified limitation, "automatic selection and preparation of client communications," does not appear anywhere in the claim other than the preamble recitation "automatically select and present financial products," and

therefore the preamble limits the scope of the claim. (Dkt. No. 411 at 12.)

Defendants further argue that the applicant again emphasized this distinction in later family members, including the '599 Patent. (*Id.*) (citing Dkt. No. 411-2 at 5 ('599 Patent FH, Feb. 19, 2009, Response)). Defendants contend that based on the applicant's statements, the examiner identified this process as the reason for allowance for ten different family members. (Dkt. No. 411 at 13) (citing Dkt. Nos. 411-3 through 411-8 ('317, '599, '867, '230, '632, and '435 Patents FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance at 2)). Defendants further argue that the file history statements are consistent with the specification, which states that the steps of the claimed invention are performed "in a fully automated or significantly automated manner" and "with little or no human intervention." (Dkt. No. 411 at 14) (quoting '434 Patent at 1:6–13, 4:1–2).

Regarding their proposal of "without manual input," Defendants argue that in the '599 Patent file history, the applicant distinguished the prior art explaining that "automatically" referred to process "without input from an agent." (Dkt. No. 411 at 14.) Defendants further argue that this in turn caused the PTO to identify the automatic process "without input from an agent" as the reason for allowance for ten different family members. (Dkt. No. 411 at 14.) Defendants contend that the applicant also argued that any automated process to automatically compose the variable information must proceed without "manual[] input" by a user to be within the claim scope. (Dkt. No. 411 at 14) (citing Dkt. No. 411-2 at 3-5 ('599 Patent FH, Feb. 19, 2009, Response)).

Defendants also argue that Plaintiffs' reliance on the doctrine of claim differentiation is overcome by the applicant's consistent and repeated emphasis that automatically means without manual input. (Dkt. No. 411 at 15.) Defendants also contend that Plaintiffs' proposed

construction effectively vitiates the concept of "automatically." (*Id.*) Defendants argue that under Plaintiffs' construction, the claims can be satisfied by any use of a computer with software, even if each step required significant amounts of manual input. (*Id.*) According to Defendants, Plaintiffs ignore the repeated statements in the specification requiring "virtually complete" automation, as well as the repeated prosecution arguments, disclaimers, and admissions that the invention requires automatic selection of financial products and automatic preparation of communications in "one process." (*Id.*)

Plaintiffs reply that Defendants incorrectly require each recited step to be part of one aggregated and continuous process whenever "automatically select and present" appears in the preamble, or introduces a series of steps in the body of the claims. (Dkt. No. 419 at 2.) Plaintiffs argue that the preambles are not limiting because the limitations of the claims set out a stand-alone method to prepare client communications. (*Id.*) Plaintiffs further contend that the limitations do not require defining the type of "client communications" that will be prepared, so referring to the preamble is unnecessary. (*Id.*)

Plaintiffs next argue that Defendants' construction violates the doctrine of claim differentiation. (*Id.*) Plaintiffs contend that when the patentee intended to refer to a single automated process, such reference was explicitly included in the claim. (*Id.*) (citing '434 Patent at claims 78, 105, 131 & 160; '317 Patent at claims 12 & 42; '632 Patent at claim 9). Plaintiffs also argue that other claims make clear that selecting and presenting may occur not as a continuous process, but instead either "at the [same] time," "separately," or "at a different time." (Dkt. No. 419 at 2) (citing '317 Patent at claims 10, 13, 40 & 43; '632 Patent at claims 8, 16, 23 & 32; '317 Patent at claim 15 & 45).

Plaintiffs further contend that the prosecution history contains no clear and unmistakable

disavowal of the claim language. (Dkt. No. 419 at 2.) Plaintiffs argue that the patentee's statements referring to "one process" were made in the context of distinguishing prior art for failing to disclose "an output device to prepare client communications," and not on the grounds of "automatically select and present" in the preambles or in the body of the claims. (*Id.*) Plaintiffs also contend that Defendants' proposed "without manual input" is incorrect because when a claim excludes human intervention it says so expressly. (*Id.* at 3) (citing '744 Patent at claim 1). Plaintiffs argue that the specifications also disclose embodiments that allow for "manual input," and embodiments where "automatic" may include a little human intervention. (*Id.*) (citing '434 Patent at 4:1-2, Figure 4). Finally, Plaintiffs argue that the prosecution history statements about "without input from an agent" were made to distinguish systems that manually combined the work of different vendors and these statements do not exclude all human intervention. (*Id.*)

For the following reasons, the Court finds that the term **"automatic[ally]"** should be construed to mean **"performed by a computer without input from a human."** The Court further finds that the preamble should be limiting when the term **"automatic[ally]"** appears in it.

### b) Analysis

The term "automatic[ally]" appears in asserted claims 2, 14, 21, 22, 41, 47, 48, 49, and 73 of the '434 Patent; asserted claims 1, 19, 52,184, 220, 226, and 260 of the '938 Patent; asserted claims 1, 24, 37, 80, 87, and 109 of the '375 Patent; asserted claims 1, 10, 25, 28, and 29 of the '744 Patent; asserted claims 1, 28, 60, and 113 of the '366 Patent; asserted claims 1 and 30 of the '184 Patent; asserted claims 1, 20, 23, 24, 25, 50, 51, 52, and 57 of the '317 Patent; asserted claims 1, 12, 17, and 25 of the '632 Patent; asserted claim 17 of the '114 Patent; and asserted claims 1, 15, 16, 26, 27, and 30 of the '435 Patent. Of these claims, the term "automatically"

appears in the preamble of asserted claims 2, 14, 21, 22, 41, 47, 48, and 49 of the '434 Patent; asserted claims 1, 52, and 226 of the '938 Patent; asserted claims 1, 37, and 80 of the '375 Patent; asserted claims 1, 28, and 29 of the '744 Patent; and asserted claims 1 and 30 of the '184 Patent. The Court agrees that the term is used in three different contexts, but finds that the term is used consistently and is intended to have the same meaning in each claim.

Specifically, the Court finds that in each situation the claims language indicates that "automatically" refers to "performed by a computer." The claims all generally relate to a computer selecting and presenting products to a client. Consistent with the claims, the specification states that the present invention "relates to apparatus and methods for marketing such products in a fully automated or significantly automated manner to achieve high volumes of transactions and sales in a short period of time." '434 Patent at 1:9–13. The specification further discloses a computer system as the apparatus that provides the automation. '434 Patent at 6:1–14. Accordingly, the Court finds that "automatically" should be construed to mean "performed by a computer."

Regarding Defendants' construction of "one aggregated and continuous process," the Court disagrees with Defendants' characterization of the prosecution history and rejects this portion of Defendants' construction. The Court finds that the applicant distinguished the Holtman reference by arguing that it was a "completely manual method" of combining separate work from three different vendors. (Dkt 411-1 at 13 ('434 Patent 2nd Reexam FH, Aug. 18, 2008, Response)). At best, this is a disavowal of a completely manual method, and does not necessarily require Defendants' proposed language. The Court also finds that the applicant distinguished the Nash and Lawlor references by arguing that there was no "disclosure for the actual preparation of a client communication," or "preparing the solicitations." (Dkt 411-1 at 22,

26 ('434 Patent 2nd Reexam FH, Aug. 18, 2008, Response)). Arguing that the prior art failed to disclose preparation of a client communication is not the same as arguing "one aggregated and continuous process." Thus, the Court does not find that the patentee made a clear and unambiguous disavowal to warrant including this language in the construction.

Moreover, the Court finds that the limitation of "a single automated process" is recited in certain dependent claims. For example, claim 78 of the '434 Patent recites "wherein a single automated process is used to select said subset of financial products and prepare said client communication." Similarly, dependent claims 105, 131, and 160 of the '434 Patent, dependent claims 12 and 42 of the '317 Patent, and dependent claim 9 of the '632 Patent each require a "single automated process." Thus, in light of the intrinsic evidence, it would be improper to read this limitation into the independent claims of the respective patents. Accordingly, the Court does not adopt this portion of Defendants' construction.

However, the Court does find that the applicant did clearly and unambiguously argue that "automatically" requires "without input from a human." Specifically, during the prosecution of the '599 Patent, the applicant argued that "[t]he present claims are directed to a continuous method that considers client and financial data, determines whether to offer a product for a specific entity, outputs an offer for the determined product, and then moves on to the next client, all these steps *without input from an agent.*" (Dkt 411-2 at 5 ('599 Patent FH, Feb. 19, 2009, Response)) (emphasis added).[1] The applicant characterized the prior art as requiring "a human

---

[1] As indicated in the chart of the patent family members, the '599 Patent is a continuation of U.S. Patent 6,076,072, which is a continuation-in-part of the '434 Patent. During prosecution, the applicant argued that "[t]he present application is a continuation-in-part of U.S. Patent 5,987,434. Applicant demonstrates here the reasons by which the present, rejected claims are also distinct from Ryan '085, for reasons that are largely similar to those urged previously to overcome Ryan '402 during prosecution of U.S. Patent 5,987,434." (Dkt 411-2 at 3 ('599 Patent FH, Feb. 19, 2009, Response)).

(i.e., not a processor)" for choosing an actual insurance policy. (Dkt 411-2 at 5 ('599 Patent FH, Feb. 19, 2009, Response)). The applicant further stated that "[a]t every interaction with Ryan's system, the user is continually providing input to the processor throughout Ryan's process." (Dkt 411-2 at 5 ('599 Patent FH, Feb. 19, 2009, Response)).

Moreover, the examiner identified this process as the reason for allowance for ten different family members by stating that "[t]he present invention is directed to methods and systems for considering client and financial data, determines [sic] whether to offer a product for a specific entity, outputs [sic] an offer for the determined product, and then moves [sic] on to the next client, these steps are performed without input from an agent." (Dkt. Nos. 411-3 through 411-8 ('317, '599, '867, '230, '632, and '435 Patents FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance at 2)). Accordingly, the Court finds that a person of ordinary skill in the art would understand that "automatically" means "without input from a human." This is consistent with the specification that states the steps of the claimed invention are performed "in a fully automated or significantly automated manner" and "with little or no human intervention." '434 Patent at 1:6–13, 4:1–2.

With this in mind, the Court turns to the issue of whether the preamble is limiting. In the "Description of the Related Art" section, the specification discusses "known automated systems" that "have been subject to a number of important limitations and drawbacks." '434 Patent at 2:63–64. The specification states that these known systems "are limited in their ability to process large volumes of prospective client communications," that "is attributable in large part to their requirement for human input and decision making as a necessary part of their operation, and because of the relatively unsophisticated nature of the known systems." '434 Patent at 3:21–26. The specification concludes this section by stating that "[a]ll of these methods and systems have

been limited in that they require a substantial amount of human involvement." '434 Patent at 3:28–29.

With this background, the specification turns to the apparatus and methods of the present invention and states that they "provide a marked departure from known financial product marketing and sales systems, for example, in that they allow for the virtually complete automation of the tasks traditionally performed by agents and telemarketers in transacting such marketing and sales." '434 Patent at 3:62–4:1. The specification adds that they can do this "[a]utomatically, with little or no human intervention and with essentially no time delays." '434 Patent at 3:62–4:3.

In light of this intrinsic evidence, a person of ordinary skill in the art would understand that it is the "automatically" limitation that provides the "marked departure" from the prior art problem of requiring human intervention. *Catalina Mktg. Int'l v. Coolsavings,com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) ("[W]hen reciting additional structure or steps underscored as important by the specification, the preamble may operate as a claim limitation.") Accordingly, the Court finds that the preamble is limiting because the term "automatically" is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999).

This finding is further confirmed by the prosecution history discussed above. Specifically, the patentee explicitly argued that "[t]he present claims are directed to a continuous method that considers client and financial data, determines whether to offer a product for a specific entity, outputs an offer for the determined product, and then moves on to the next client, all these steps *without input from an agent.*" (Dkt. No. 411-2 at 5 ('599 Patent FH, Feb. 19, 2009, Response)) (emphasis added). Likewise, the examiner identified this process as the reason

for allowance for ten different family members. (Dkt. Nos. 411-3 through 411-8 ('317, '599, '867, '230, '632, and '435 Patents FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance at 2))

Plaintiffs argue that when the applicant intended for "automatic[ally]" to be without human involvement, he claimed so expressly. (Dkt. No. 385 at 11.) Plaintiffs argue that conversely, when the patentee did not intend to exclude "human intervention," no reference was made to it. (*Id.*) The Court disagrees and finds that Plaintiffs' argument ignores the prosecution history and the statements made in the specification. Accordingly, for the reasons discussed above, the Court finds that the applicant clearly and unambiguously disclaimed "input from a human." That said, the disclaimer does not mean that a human cannot initially set-up or program the system, it only means that there is no input from a human when performing the elements recited in the claims.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the term **"automatic[ally]"** to mean **"performed by a computer without input from a human."** The Court further finds that the preamble is limiting when the term **"automatic[ally]"** appears in it.

## 2. "financial product[s] [and/or] [financial] services"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "financial product[s] [and/or] [financial] services" | "any financially-related product, service or plan" | "insurance products [and/or services] and other forms of financial instruments. For the avoidance of doubt, discounts, pricing or payment terms, coupons, or other financial incentives do not transform a nonfinancial product into a financial product" |

### a) The Parties' Positions

The parties dispute whether the term(s) "financial product[s] [and/or] [financial] services" should be construed to mean "any financially-related product, service or plan," as Plaintiffs propose, or if it should be construed to mean "insurance products [and/or services] and other forms of financial instruments," as Defendants propose. Defendants also propose the negative limitation of: "For the avoidance of doubt, discounts, pricing or payment terms, coupons, or other financial incentives do not transform a nonfinancial product into a financial product."

Plaintiffs contend that term "financial product" (and variations thereof) should be construed consistent with the broad and ordinary meaning included in the specification. (Dkt. No. 385 at 12.) Plaintiffs argue that the specification states that "'[f]inancial product' as the term is used herein is used in its broad sense to include any financially-related product, service or plan." (*Id*.) (citing '938 Patent at 6:56–58; '184 Patent at 6:49–51; '114 Patent at 6:56–58; '375 Patent at 6:33–35; '744 Patent at 6:36–38; '366 Patent at 6:33–35). Plaintiffs also argue that the '434 Patent uses the term in its broad sense, encompassing "insurance of all types, . . . annuities of all types, . . . and the like," but "not necessarily limited to th[o]se products." (Dkt. No. 385 at 12) (quoting '434 Patent at 5:50–67). Plaintiffs further contend that the '434 Patent expressly provides that "[t]he variety of financial products, even for a given need, is substantial," and that

"[f]inancial products . . . also may include other forms of financial instruments." (Dkt. No. 385 at 12) (quoting '434 Patent at 2:34–36, 5:56–57). Plaintiffs argue that the Asserted Patents provide numerous examples of financial products, emphasizing the broad scope of "financial products." (*Id*. at 12–13) (citing '938 Patent at 6:56–7:10, 14:16–48).

Plaintiffs also contend that the claim language confirms that the term "financial product" is used in its broad sense. (*Id*. at 13.) Plaintiffs argue that during reexamination, the patentee narrowed claims 14, 20, 41, and 47 of the '434 Patent by replacing the term "financial product" with "life insurance product." (*Id*.) (citing 385-16 at 2-6, 12 (Nov. 11, 2006 Remarks)). Plaintiffs also argue that the extrinsic evidence is consistent with the applicant's broad understanding of the term "financial product." (*Id*.) (citing Dkt. Nos. 385-17, 385-18, 385-19, 385-20, & 385-21).

Plaintiffs further argue that Defendants admit that "financial products" encompass a variety of financial instruments, but limit the term by focusing on "insurance products" and "instruments," and inject a negative limitation into their construction. (*Id*. at 14.) Plaintiffs argue that Defendants therefore limit the term to a single positive example of a financial product (i.e., insurance products). (*Id*.) Plaintiffs further argue that Defendants' construction also impermissibly excludes "discounts, pricing or payment terms, coupons, or other financial incentives." (*Id*. at 15) Plaintiffs argue that many of the asserted patents expressly refer to "assurance products and money saving products such as . . . warranty plans (home, automobiles, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty plans; and the like." (*Id*.) (quoting '938 Patent at 14:44–48; '184 Patent at 14:21–25; '114 Patent at 14:36–40). Plaintiffs further argue that there is no support for excluding "pricing or payment terms," and "other financial incentives." (*Id*.) Plaintiffs argue that "pricing and payment terms" and "financial incentives" are characteristics of installment loans, timed payment vehicles, money

saving products, warranties, and other financial products expressly identified in the intrinsic record. (*Id*.)

Defendants respond that their construction is taken directly from the applicant's express statements in the intrinsic record. (*Id*.) Defendants contend that the first portion of the construction is the specification's explicit definition, and the second portion applies the applicant's prosecution disavowal as to what a "financial" product is not. (*Id*.) Defendants argue that Plaintiffs' construction of "financially-related" introduces ambiguity as to whether this phrase modifies the nature of the product offered or the nature of the offer itself (e.g., pricing terms). (*Id*.) Defendants contend that under Plaintiffs' construction, anything that has monetary value is a "financial product." (*Id*. at 15–16.) Defendants argue that this is irreconcilable with both the express definition of this term in the specification and the plain and ordinary meaning. (*Id*. at 16.)

Defendants argue that each of the ten Asserted Patents define "financial products as the term is used in this document refers to insurance products such as individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, and the like. Financial products, however, also may include other forms of financial instruments." (*Id*.) (quoting '434 Patent at 5:52–57). Defendants contend that their construction is taken directly from this passage. (*Id*.) Defendants further argue their construction is not limited to "insurance products," but also includes other "financial instruments," which they contend is a well-understood accounting term. (*Id*.) (citing Dkt. No. 411-13 at 2–3 (Halsey G. Bullen, et. al., The Fundamental Financial Instrument Approach (1989)). According to Defendants, the inclusion of "other forms of financial instruments," includes all of the examples from the specification. (*Id*.)

Defendants further argue that their construction is consistent with a second definition

contained in the continuation-in-part specification included in some, but not all, of the Asserted Patents. (*Id*. at 17–18) (quoting '744 Patent at 6:36–40 ("'Financial product' as the term is used herein is used in its broad sense to include any financially-related product, service or plan. The term would include, for example, insurance products and services, banking products and services, securities and investment products and services, and the like."). Defendants argue that this definition begins by focusing on "insurance products," and then provides other closely-related exemplary categories of insurance, banking, and securities and investment products. (*Id*. at 17.) Defendants contend each of these examples are "financial instruments" and are within their construction. (*Id*.) Defendants further argue that none of the examples suggests that "financially-related" is intended to encompass non-financial products (such as automobiles, cruise, or airline travel packages, or telecommunications services bundles) that happen to be offered with discounts or monetary incentives. (*Id*.)

Defendants further contend that the prosecution history confirms that term "financially-related" does not mean that offering a discount or other financial incentive transforms a non-financial product into a "financial" product. (*Id*.) Defendants argue that during the prosecution of the '599 Patent, the applicant argued that a coupon offering "a 'discount' on the price of a tangible product" was not an offer for a financial product because the "'discount' cannot be characterized as a financial product itself." (*Id*.) (quoting Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). Defendants note that the applicant further argued that "[n]or can that 'discount' be characterized as an offering of a financial product or service. At best, it is an offering of a reduction on the price of a product to which the coupon applies." (*Id*. at 17–18) (quoting Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). According to Defendants, their construction accurately reflects this clear and unambiguous disavowal of claim

scope. (*Id.* at 18.)

Regarding Plaintiffs' argument that Defendants' construction is incorrect because the specification uses the word "discount," Defendants argue that the specification lists "discount clubs or programs (e.g. dental, travel, etc.)" as examples of "money saving products." (*Id.*) (quoting '938 Patent at 14:44–47). Defendants contend that the product offered is a program of financial discounts, and is not an offering for dental services (i.e., a medical, not financial, service), for example, coupled with a discount. (*Id.*) Defendants argue that this is consistent with the applicant's statements that "an offering of a reduction on the price of a product" and a "'discount' cannot be characterized as a financial product." (*Id.*) (quoting Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). Defendants contend that none of the cases cited by Plaintiffs regarding negative limitations address an express disclaimer. (*Id.*) Defendants argue that their construction ensures that Plaintiffs do not recapture claim scope that was expressly disavowed during prosecution. (*Id.* at 18–19.)

Regarding Plaintiffs' construction, Defendants argue that "any financially-related product or plan" does nothing to clarify the scope of the claim and is therefore not a proper construction. (*Id.* at 19.) Defendants argue that Plaintiffs' construction does not resolve whether "financially-related" refers to the financial nature of the product or could more broadly cover offers for non-financial products that happen to include a financial term (e.g., discounted price). (*Id.*) Defendants argue that the applicant clearly disavowed the latter claim scope, thus a construction that recaptures that which was disclaimed is improper. (*Id.*) Defendants argue that under Plaintiffs' interpretation, the term would impermissibly reach beyond the scope of "financial instruments" as defined in the '434 Patent, whose claims include "financial product." (*Id.*)

Plaintiffs reply that what Defendants label as a definition from the specification is just a

list of examples. (Dkt. No. 419 at 3.) Plaintiffs further argue that Defendants do not even use the complete list, but instead focus on a single example (insurance products) and inject negative limitations that appear nowhere in the claims or specifications. (*Id*.) Plaintiffs contend that the applicant's general definition was that the "term is used in its broad sense to include any financially-related product, service or plan." (*Id*.) (quoting '938 Patent at 6:56–58). Plaintiffs argue that the many listed examples confirm that "financial products" is "used in its broad sense." (*Id*.)

Regarding Defendants' reference to "financial instruments," Plaintiffs argue that dictionaries define the term as "any written instrument having monetary value or evidencing a monetary transaction." (*Id*.) (quoting Dkt. No. 385-19 (Dictionary of Investing (1993))). Plaintiffs argue that this example is consistent with the specification's definitional statement. (*Id*.) Plaintiffs also argue that during prosecution, the applicant did not clearly and unambiguously state that "discounts, pricing or payment terms, coupons, or other financial incentives" are "nonfinancial products," as Defendants contend. (*Id*. at 4.) Plaintiffs argue that the applicant explained that a "'discount' cannot be characterized as a financial product itself." (*Id*.) (quoting Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). Plaintiffs further argue that the specification refers to "product pricing information . . . payment terms, available financing terms, etc.," and "discount clubs or programs (e.g., dental, travel, etc.); extended warranty plans; and the like." (*Id*.) (quoting '938 Patent at 12:27–38, 14:44–48).

For the following reasons, the Court finds that the term(s) **"financial product[s] [and/or] [financial] services"** should be construed to mean **"products, services, or plans relating to insurance, banking, securities and investment, pricing information, assurance, money saving, and the like. A coupon or discount on the price of a tangible product is not a**

**financial product or financial service by itself."**

### b) Analysis

The term(s) "financial product[s] [and/or] [financial] services" appears in asserted claims 2, 21, 22, 48, 49, 62, 66, 68, 69, 72, 73, 74, 106, 109, 114, 119, 121, 122, 125, and 127 of the '434 Patent; asserted claims 1, 52, 184, and 226 of the '938 Patent; asserted claims 1, 8, 27, 28, 37, 80, 87, 93, and 113 of the '375 Patent; asserted claims 1, 7, 28, 29, and 30 of the '744 Patent; asserted claims 1, 21, 22, 27, 28, 60, and 113 of the '366 Patent; asserted claims 1 and 30 of the '184 Patent; asserted claim 13, 17, 18, 19, 23, and 29 of the '114 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the specification of the '434 Patent and the specification of the '938 Patent provide an explicit definition of the disputed term. Specifically, the '434 Patent defines "financial products" as follows:

> Financial products as the term is used in this document refers to *insurance products* such as individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, and the like. Financial products, however, also may include *other forms of financial instruments*.

'434 Patent at 5:52–57 (emphasis added). Similarly, the '938 Patent defines "financial products" as follows:

> "Financial product" as the term is used herein is used in its broad sense to include any financially-related product, service or plan. The term would include, for example, *insurance products and services, banking products and services, securities and investment products and services, and the like*. Examples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the like. Examples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related products, etc. Securities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc.

'938 Patent at 6:56–7:3 (emphasis added). The '938 Patent further states:

As noted, the variable financial product information may pertain to a single financial product or to a plurality of different financial products. The variable financial product information may comprise or pertain to, for example, one or more *insurance-related products.* Examples would include property and casualty insurance products, as well as non-property and non-casualty insurance products. The latter grouping would include individual life insurance products such as individual term life insurance products and individual life insurance products other than term, such as permanent life insurance products. Permanent life insurance products would include such things a whole life, universal life, and the like. Where combinations of insurance products are included, they may include, for example, a combination of an individual term life insurance product and an individual permanent life insurance product. Other types of insurance products to which the variable information may pertain include credit life, disability, and unemployment insurance; health insurance products; disability insurance products; annuities; etc.

The variable financial product information also may comprise or pertain to *bank-related products* such as information on various types of demand deposit accounts, savings accounts and product, loan products, credit products, etc. Where the variable financial product information pertains to *financial investments or brokerage-type products*, the information may comprise or pertain to various investment products, financial securities, equity instruments such as common and/or preferred stocks, stock options, warrants and the like, debt instruments, money market funds, mutual funds, derivatives, etc. The variable financial information may comprise or pertain to financial product *pricing information* or financial product non-pricing information, or both.

The variable financial information may also include *assurance products and money saving products* such as information on warranty plans (home, automobile, electronics, etc.); discount clubs or programs (dental, travel, etc.); extended warranty plans; and the like.

'938 Patent at 14:14-48 (emphasis added). As indicated above, the specification indicates that a "financial product[s] [and/or] [financial] services" include insurance products and services, banking products and services, securities and investment products and services, pricing information, assurance products and services, money saving products and services, and the like. The specification provides a number of examples of each of these types of products and services.

For example, the specification states that "[e]xamples of insurance products would include individual life insurance of all types, tax deferred annuities of all types, health insurance of all types, disability insurances of all types, annuities or other timed payment vehicles, and the

like." '938 Patent at 6:61–65. Similarly, the specification states that "[e]xamples of banking products would include savings-related products and services, demand deposit products and services, loan products and services, credit-related products, etc." '938 Patent at 6:65–7:1. Likewise, the specification states "[s]ecurities and investment products and services would include equity securities, debt securities, mutual funds, money markets, derivatives, etc." '938 Patent at 7:1–3. The specification also provides examples of "assurance products and money saving products such as information on warranty plans (e.g., home, automobile, electronics, etc.); discount clubs or programs (e.g., dental, travel, etc.); extended warranty plans; and the like." '938 Patent at 14:44–48. Accordingly, the Court finds that the term "financial product[s] [and/or] [financial] services" should be construed to mean "products, services, or plans relating to insurance, banking, securities and investment, pricing information, assurance, money saving, and the like."

However, the prosecution history of a non-asserted family member, U.S. Patent No. 7,711,599 ("the '599 Patent") indicates that a coupon or discount on the price of a tangible product is not by itself a "financial product[s] [and/or] [financial] services."[2] Specifically, in distinguishing a reference that disclosed providing grocery store coupons, the applicant argued "that a coupon offering "a 'discount' on the price of a tangible product" was not an offer for a financial product because the "'discount' cannot be characterized as a financial product itself." (Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). The applicant further argued that "[n]or can that 'discount' be characterized as an offering of a financial product or service. At

_____

[2] The Court finds that the arguments made during the prosecution of the '599 Patent are relevant to all of the Asserted Patents. A number of the Asserted Patents share a common specification with the '599 Patent. In addition, the applicant recognized, and argued to the Patent Office that "when a patent has the same or virtually identical disclosure as another patent, comments made during prosecution of either patent bear on the public's interpretation of like terms." (Dkt. No. 411-14 at 6 ('072 Patent Reexam FH, July 20, 2009, Response)).

best, it is an offering of a reduction on the price of a product to which the coupon applies." (Dkt. No. 411-15 at 4 ('599 Patent FH, Sep. 14, 2007 Response)). The Court finds that this is a clear and unambiguous statement that a coupon or discount on the price of a tangible product is not— by itself—a "financial product[s] [and/or] [financial] services."

Regarding Defendants' construction, the Court finds that it is overly limiting and focuses on only one type of the disclosed "financial products." Indeed, the '938 Patent states that the term "financial product" is used in "its broad sense to include any financially-related product, service or plan." '938 Patent at 6:56–58. Moreover, the specification indicates that a "financial product[s] [and/or] [financial] services" includes not only insurance products and services, but also includes banking products and services, securities and investment products and services, pricing information, assurance products and services, money saving products and services, and the like. This point is further illustrated by the claim language. For example, claims 1 and 2 of the '434 Patent refer only to "financial products," while claims 14 and 19 expressly identify life insurance. '434 Patent at claims 1, 2, 14, & 19.

Furthermore, the Court is not persuaded that including "other forms of financial instruments" is helpful to the jury or resolves the parties' dispute. Indeed, it is clear that the parties dispute the meaning of the term "financial instruments." (*See* Dkt. No. 419 at 3.) Likewise, the Court is not persuaded that other than addressing the "coupons" and "discount" argument made by the applicant during prosecution, Defendants' negative limitation is warranted. Accordingly, the Court rejects Defendants' construction.

Turning to Plaintiffs' construction, the Court finds that it is too broad and inconsistent with the intrinsic evidence. Plaintiffs' construction provides no context or guidance on how a person of ordinary skill in the art would interpret the term "financial product." As discussed

above, the specification explicitly states what types of products are considered "financial products" and provides numerous example of each of these types. While the claims are not limited to these specific examples, they do indicate to a person of ordinary skill in the art the characteristics of the recited "financial products," and establish a bound on what constitutes a "financial product."

Moreover, the prosecution history indicates that the term "financial product" is not just "any" financially-related product. Specifically, Plaintiffs' construction could arguably include "coupons" or "discounts" because they are "financially-related" to a product. As discussed above, the applicant clearly and unambiguously stated that "coupons" or "discounts" where not by themselves "financial products." Furthermore, the Court finds that Plaintiffs' construction is unhelpful because it simply replaces the word "financial" with "financially-related." Defining "financial" as "financially-related" fails to provide any useful guidance to the jury. Accordingly, the Court rejects Plaintiffs' construction. Finally, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term(s) **"financial product[s] [and/or] [financial] services"** to mean **"products, services, or plans relating to insurance, banking, securities and investment, pricing information, assurance, money saving, and the like. A coupon or discount on the price of a tangible product is not a financial product or financial service by itself."**

### 3. "financial" when used in the preamble

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "financial" when used in the preamble | not limiting | the preamble is limiting |

### a) The Parties' Positions

The parties dispute whether the preamble is limiting when the term "financial" appears in it. Plaintiffs contend that in cases where the term "financial" appears only in the preamble of the asserted claims, there is a presumption that the term is not limiting. (Dkt. No. 385 at 15.) Plaintiffs argue that the limitations in the body of the claims of the '184 Patent set forth the claimed inventions. (*Id*.) Plaintiffs contend that terms in the preamble like "financial" are not referenced in the body and are not needed to "give life" to the claims. (*Id*.) (citing '184 Patent at claim 1).

Defendants respond that the preambles of claims 1 and 30 of the '184 Patent are limiting because the body of the claims derive antecedent basis from the preamble. (Dkt. No. 411 at 22.) Defendants argue that these claims recite in the preamble "communication data outputs for [sic] plurality of clients relating to a financial product or service." (*Id*.) Defendants contend that the body of the claims recite generating "communication data outputs comprising an offer for a particular type of product or service." (*Id*.) Defendants argue that without relying on the preamble, it is impossible to know from what group the particular type of product is selected. (*Id*.) Defendants argue that the preamble makes clear that the particular type of product must be one that is "a financial product or service," and thus limits the claims. (*Id*.)

Plaintiffs reply that nothing in the claim language requires a group of products, or selecting a product. (Dkt. No. 419 at 4.) Plaintiffs argue that the relevant claim language requires only "communication data outputs comprising an offering for a particular type of product or service." (*Id*.) (quoting '184 Patent at 34:21–22, 36:36–37). Plaintiffs further argue that the preambles are not necessary because the limitations set out the full process, and "communication data outputs" is defined as just "an offering for a particular type of product or service" of any sort. (*Id*.)

For the following reasons, the Court finds that the preamble should be limiting when the term **"financial"** appears in it.

### b) Analysis

The term "financial" appears in the preamble of asserted claims 2, 21, 22, 48, and 49 of the '434 Patent; asserted claims 1 and 184 of the '938 Patent; asserted claims 1, 28, and 29 of the '744 Patent; and asserted claims 1 and 30 of the '184 Patent. The Court finds that the use of the term "financial" in the preamble is consistent and is intended to have the same meaning in each claim. The Court further finds that the preamble is limiting when the term "financial" appears in it. A review of the '184 Patent specification finds that it only describes marketing of "financial" products and refers to "the present invention" as being directed to marketing of financial products. For example, the '184 Patent states that "[i]n accordance with the invention, an apparatus and method are provided for automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients." '184 Patent, 5:44–47. In addition, a person of ordinary skill in the art would find that the only products or services discussed in the specification are financial products and services. *See, e.g.,* '184 Patent at 11:23–26, 12:7–41, 13:30–14:25, 16:46–17:4, 18:44–22:55, 25:21–27:31, Figures 8–12, 17, and 19.

The Court also finds the specifications of patents to which the '184 Patent claims priority similarly state "[t]he present invention relates to apparatus and methods for marketing financial products such as individual insurance policies," and that "[t]he present invention relates to methods and apparatus for automatically preparing financial product and/or financial service-related communication . . . ." '434 Patent at 1:7–9; '072 Patent at 1:13–15. When "a patent thus describes the features of 'the present invention' as a whole, this description limits the scope of

the invention." *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007). Accordingly, the Court finds that in this instance the specification limits the claims of the '184 Patents to financial products or services. Therefore, the Court finds that the preamble is limiting because the term "financial" is "necessary to give life, meaning, and vitality" to the claim. *Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1305 (Fed. Cir. 1999).

### c) Court's Construction

In light of the intrinsic evidence, the Court finds that the preamble is limiting when the term **"financial"** appears in it.

### 4. "products [or services]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "products [or services]" | plain meaning | "insurance products [and/or services] and other forms of financial instruments. For the avoidance of doubt, discounts, pricing or payment terms, coupons, or other financial incentives do not transform a nonfinancial product into a financial product" |

### a) The Parties' Positions

The parties dispute whether the term "product" should be construed the same as the term "financial product." Plaintiffs contend that the term should be given its plain and ordinary meaning. (Dkt. No. 385 at 16.) Plaintiffs argue that nothing in the claims suggests that "products [or services]" is used in anything but its plain and ordinary sense. (*Id*. at 17) (citing '317 Patent at claim 1; '435 Patent at claims 5 and 28). Plaintiffs also argue that other courts agree that the term requires no construction. (*Id*.) Plaintiffs further contend that Defendants' construction should be rejected for the same reasons discussed above for the term "financial products." (*Id*.) Plaintiffs further argue that Defendants' construction is also inconsistent with the intrinsic

record. (*Id*. at 18.) Plaintiffs contend that the claims of the '632 Patent, the '317 Patent, and the '435 Patent make no reference to "financial," and that the '184 Patent refers only to "financial" in the non-limiting preamble. (*Id*.)

Plaintiffs further contend that during prosecution of the '317 Patent and '435 Patent, the applicant distinguished the inventions from claims directed to "financial products." (*Id*.) Plaintiffs argue that the applicant explained that "the claim term 'product data' refers to financial or other products," and the examiner allowed the application with that understanding. (*Id*.) (quoting Dkt. No. 385-22 at 4 (Jun. 25, 2012 '317 Remarks)). Plaintiffs further argue that the applicant repeated the comment after allowance of the base claims, when adding more dependent claims. (*Id*.) (citing Dkt. No. 385-23 at 4 (Aug. 28, 2012 '317 Remarks)). Plaintiffs contend that the applicant also amended the abstract to the '317 Patent and titles of the '317 Patent and '435 Patent to remove references to "financial products," explaining that the amendments were made "to better correspond to the claims of the current application" and "to more closely match the claim language." (*Id*.) (citing Dkt. No. 385-24 at 4 (Apr. 26, 2012 '317 Remarks); Dkt. No. 385-25 at 2 (Apr. 6, 2012 '317 Remarks); Dkt. No. 385-26 at 11 (Feb. 24, 2014 '435 Remarks)).

Defendants respond that the recitation of "product" in each asserted independent claim of the '317 Patent and the '184 Patent is limited to "financial products" based on the consistent statements in the specification that "the present invention" is limited to "financial products." (*Id*. at 19) (citing '317 Patent at 1:32–34, 1:38–3:51, 3:53–4:3; '184 Patent at 5:44–47). Defendants argue that the only products or services discussed in the specification are financial products and services. (*Id*. at 20.) Defendants further contend that the specification expressly defines the term "client communication" as "a communication which is prepared for a given client and which provides information to the client about one or more selected financial products and/or financial

services and/or related financial plans." '184 Patent at 6:21–25. According to Defendants, the specification limits the claims of the '317 Patent and '184 Patent to financial products or services.

Defendants further argue that Plaintiffs fail to acknowledge these specification's statements and fail to identify a single example in the specification of a non-financial product. (*Id.* at 21.) Defendants argue that Plaintiffs instead point out that during prosecution some sixteen years after the purported 1996 priority date the applicant attempted to expand the claims beyond financial products. (*Id.*) Defendants argue that the Federal Circuit has rejected similar attempts at untimely expansion of claim scope. (*Id.*)

Plaintiffs reply that the applicant did not limit "the invention" to financial products. (Dkt. No. 419 at 4.) Plaintiffs argue that the specifications say the invention is "not . . . limited" to such products. (*Id.* at 5) (citing '317 Patent at 6:20–21). Plaintiffs contend that what Defendants call "the invention" is only one embodiment. (*Id.*) (quoting '317 Patent at 6:4–6) ("The presently preferred embodiment of the invention . . . for transacting marketing and sales of financial products."). Plaintiffs further argue that the specifications state that "[f]or purposes of illustration and not by way of limitation, the financial products [are] in connection with the preferred embodiment and preferred method . . . [and] the invention is not necessarily limited to these products." (*Id.*) (quoting '317 Patent at 6:13–21). Plaintiffs also argue that Defendants' quote from the '184 Patent omits the full context. (*Id.*) Plaintiffs contend that the quote comes from the "description of the preferred method and embodiment," which "illustrate[s] aspects of the invention, and point[s] out certain preferred embodiments . . . ." (Dkt. No. 419 at 5) (quoting '184 Patent at 5:25–30).

Plaintiffs argue that the statements Defendants try to downplay were made during

prosecution of the applications that issued as the patents containing the term construed here (i.e., the '317 Patent and '435 Patent). (*Id.*) Plaintiffs also argue that the applicant expressly claimed financial products only when intended. (*Id.*) Plaintiffs argue that while the independent claims of the '184 Patent do not mention financial products, several dependent claims recite "the product or service in the offering [is] a loan," "credit card," "insurance," "demand deposit account," "investment account," and "from the group of loan, credit card, and insurance." (*Id.* at 5–6) (citing '938 Patent 35:65–36:28). Plaintiffs also argue that whereas the claims of the '434 Patent refer to "financial products," none of the claims of the '317 Patent, the '435 Patent, or the '632 Patent do. (*Id.* at 6.)

For the following reasons, the Court finds that the term **"products [or services]"** should be construed the same as "financial product[s] [and/or] [financial] services."

### b) Analysis

The term "products [or services]" appears in asserted claims 1, 4, 17, 20, 22, 23, and 30 of the '184 Patent; asserted claim 1, 9, 25, and 52 of the '317 Patent; asserted claims 3 and 27 of the '632 Patent; and asserted claims 5 and 28 of the '435 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds the intrinsic evidence indicates that the term "product" should be construed the same as "financial product." Specifically, the '317 Patent opens with the statement that "[t]he present invention relates to apparatus and methods for marketing financial products such as individual insurance policies." '317 Patent at 1:32–34. Moreover, the entirety of the "Description of the Related Art" discusses marketing of "[f]inancial products such as life insurance products." '317 Patent at 1:38–3:51. To that end, each of the three listed "Objects of the Invention" relates to "transacting financial product marketing." '317 Patent at 3:53–4:3.

Similarly, the '184 Patent states that "[i]n accordance with the invention, an apparatus and method are provided for automatically preparing client communications pertaining to one or more financial products, and/or financial services, and/or financial plans for clients." '184 Patent, 5:44–47. In addition, a person of ordinary skill in the art would find that the only products or services discussed in the specification are financial products and services. *See, e.g.,* '184 Patent at 11:23–26, 12:7–41, 13:30–14:25, 16:46–17:4, 18:44–22:55, 25:21–27:31, Figures 8–12, 17, and 19. Accordingly, the Court finds that there is no support in the intrinsic records for anything other than products meaning "financial products." *Verizon Servs. Corp.,* 503 F.3d at 1308 ("a patent describes the features of 'the present invention' as a whole, this description limits the scope of the invention.").

Plaintiffs contend that the claims of the '632 Patent, '317 Patent, and '415 Patent make no reference to "financial," and that the '184 Patent refers only to "financial" in the preamble. (Dkt. No. 385 at 18.) Although this statement is true, it ignores the well-established principle that claims are not interpreted in a vacuum. *Demarini Sports v. Worth*, 239 F.3d 1314, 1327 (Fed. Cir. 2001) ("We note that claim terms are not construed in a vacuum. Rather, to interpret claim terms we look to all of the intrinsic evidence as it pertains to the terms in question."). Here, the intrinsic evidence indicates to a person of ordinary skill in the art that the recited "product" is referring to a "financial product." Indeed, there is not a single non-financial product disclosed or mentioned in the specification.

Plaintiffs also point to the '317 specification's statement that "the invention is not necessarily limited to these products," and contend that it shows that the applicant did not limit "the invention" to financial products. (Dkt. No. 419 at 5) ('317 Patent at 6:13–21). Plaintiffs' argument, however, ignores the fact that the "products" this statement is referring to are specific

examples of life insurance products, and not the larger class of "financial products." Specifically, the specification states that "[e]xamples of life insurance would include individual term and permanent life insurance instruments such as whole life, universal life, level and decreasing term life insurance, and the like. It is to be understood, however, that the invention is not necessarily limited to these products." '317 Patent at 6:16–21. Plaintiffs remove the leading sentence from their quote, and thereby remove the context for which the statement appears.

The Court is also not persuaded by Plaintiffs' contention that during prosecution of the '317 Patent and '435 Patent, the applicant expressly distinguished the inventions from claims directed to "financial products." According to Plaintiffs, the applicant explained that "the claim term 'product data' refers to financial or other products," and the examiner allowed the application with that understanding. (Dkt. No. 385 at 18) (quoting Dkt. No. 385-22 at 4 (Jun. 25, 2012 '317 Remarks)). Plaintiffs further note that the applicant repeated the comment after allowance of the base claims, when adding more dependent claims, which the examiner again approved. (*Id.*) (citing Dkt. No. 385-23 at 4 (Aug. 28, 2012 '317 Remarks)). Reviewing the prosecution history, the Court finds that the applicant referenced the same language discussed above (i.e., "the invention is not necessarily limited to these products"). Again, when read in its proper context, a person of ordinary skill in the art would understand that this statement is not limiting the products to life insurance products.

Moreover, even if this statement is purported to show that the applicant was attempting to expand the claims beyond financial products, the Court finds that the applicant's statement is contrary to what he clearly identified as the invention. The Federal Circuit has held that where the specification "clearly identifies what [the] invention is, an expression by an applicant during prosecution that he intends his claims to cover more than what his specification discloses is

entitled to little weight." *Honeywell Int'l, Inc. v. ITT Indus., Inc.,* 452 F.3d 1312, 1319 (Fed. Cir. 2006); *see also Biogen, Inc. v. Berlex Labs.*, Inc., 318 F.3d 1132, 1140 (Fed. Cir. 2003) ("Representations during prosecution cannot enlarge the content of the specification."). Accordingly, the Court rejects Plaintiffs' argument that the applicant should be allowed to expand the scope of the claims sixteen years after the indicated priority date.[3] Finally, the Court does not adopt Defendants' construction for the same reason discussed above for the term "financial product."

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the term **"products [or services]"** the same as "financial product[s] [and/or] [financial] services."

### 5. "offer[ing]"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "Offer[ing]" | plain meaning | "information relating to an offered financial product or service" |

### a) The Parties' Positions

The parties dispute whether the term "offer[ing]," when used as a noun, should be construed as "information relating to an offered financial product or service," as Defendants propose. Plaintiffs argue that the terms "offer" or "offering" are simple and commonly understood words that require no construction. (Dkt. No. 385 at 18.) Plaintiffs contend that the claims confirm that the applicant used these terms consistent with their plain and ordinary meaning. (*Id.*) (citing '435 Patent at claims 1, 5, and 6). Plaintiffs argue that nothing in the claims suggests that the applicant intended "offer" to mean anything less than an offer for any product or service. (*Id.* at 19.) Plaintiffs further argue that when the applicant intended that the

---

[3] During the claim construction hearing, Plaintiffs indicated that they intend to rely on the priority date of the '434 Patent as it relates to this disputed term.

"offer" be for a specific type of product or service, he recited it in the claims. (*Id.*) (citing '434 Patent at claim 66).

Plaintiffs further argue that the specifications of the patents also confirm that the term is used according to its plain and ordinary meaning. (*Id.*) Plaintiffs contend that in each of the asserted patents the specifications describe a sample presentation consisting of eight sections, where "Section 1 describes the 'need' for the proposed product and why the proposal or offer is being made to the client." (*Id.*) (quoting '434 Patent at 16:24–25). According to Plaintiffs, this indicates that the "offer" is equated as simply a "proposal" to purchase a product. (*Id.*)

Regarding Defendants' construction, Plaintiffs argue that nothing in the claim language refers to a "financial product," and there is no basis to limit the claims as Defendants propose. (*Id.*) Plaintiffs contend that for claims that specifically refer to "financial products [or services]," interpreting "offer" as referring to "financial products" is redundant and nonsensical. (*Id.* at 20.) Plaintiffs also argue that Defendants' proposal to change "offer" to "information" is flawed. (*Id.*) According to Plaintiffs, not all "information relating to" a product or service is an "offer," and not all "offers" are accompanied by "information" about a product or service. (*Id.*)

Defendants respond that the specification uses the term "offer" to refer to information related to the offered product or service, and makes clear that the only type of products within the invention are financial products. (Dkt. No. 411 at 24) (citing '435 Patent at 1:25–27, 1:31–3:47, 3:46–63, 16:11–17:61, Figures 5–9, 14). Regarding Plaintiffs' argument that inserting Defendants' construction in the claims makes the claims nonsensical, Defendants argue that where the term "offer" is used as a noun, their construction is consistent with the surrounding claim language. (*Id.*)

Plaintiffs reply that when the applicant intended "offer" to refer to a financial product, it

was expressly recited it in the claims. (Dkt. No. 419 at 6) (citing '434 Patent at claim 66). Plaintiffs further argue that "offer" does not "refer to information related to the offered product," as Defendants argue. (*Id*.) (quoting Dkt. No. 411 at 24). Plaintiffs contend that the intrinsic evidence describes a section of a sample letter that "describes the 'need' for the proposed product and why the proposal or offer is being made . . . ." (*Id*.) ('435 Patent at 16:14–23). According to Plaintiffs, the particular section of the letter includes "information related to the offered product or service," and not the "offer." (Dkt. No. 419 at 6.)

Plaintiffs further contend that Defendants admit that their construction makes no sense, at least when "offer" is used as a verb and not a noun. (*Id*.) Plaintiffs contend that whether the term "offer" is used as a noun or a verb, Defendants' construction still does not make sense. (*Id*.) Plaintiffs argue that Defendants' noun-only construction lacks the clarity of the plain meaning of the term "offer." (*Id*.)

For the following reasons, the Court finds that the term **"offer[ing]"** should be given its **plain and ordinary meaning.**

### b) Analysis

The term "offer[ing]" appears in asserted claims 66, 93, and 119 of the '434 Patent; asserted claims 1, 52, 184, and 226 of the '938 Patent; asserted claims 1, 22, 37, 80, 87, and 107 of the '375 Patent; asserted claim 28 of the '744 Patent; asserted claims 1, 17, 27, 28, 60, and 113 of the '366 Patent; asserted claims 1, 4, 9, 17, 20, 22, 27, 30, and 35 of the '184 Patent; asserted claims 1, 24, 25, 51, and 52 of the '317 Patent; asserted claims 1, 17, and 25 of the '632 Patent; asserted claims 13, 14, 17, 19, 21, 22, and 29 of the '114 Patent; and asserted claims 1, 5, 9, 15, 16, 28, 29, and 30 of the '435 Patent. The Court finds that the term is used consistently in these claims and is intended to have the same meaning in each claim. Having reviewed the

intrinsic evidence, the Court finds that the term "offer[ing]," when used as a noun or verb, is unambiguous, is easily understandable by a jury, and requires no construction. Moreover, Defendants' construction includes a form of the disputed term in their proposed construction. This confirms that the term "offer[ing]" is not confusing or ambiguous. Therefore, the term will be given its plain and ordinary meaning.

Regarding Defendants' construction, the Court agrees that the terms "financial product" and "product" include different types of financial products and services. However, this does not mean that every term that appears in the claims must have the words "financial product or services." Moreover, the Court finds that when the patentee intended that the "offer" be for a specific type of product or service, he recited so in the claims. For example, claim 66 of the '434 patent refers to "calculating one or more amounts and/or costs of one or more particular financial products to offer to each client." '434 Patent at 9:59–61. Accordingly, the Court is not persuaded by Defendants' cite to the specification because it is referring to financial products and not an "offer[ing]." Therefore, the Court rejects Defendants' arguments to the extend they contend that the term "offer[ing]" includes offered financial product or service.

### c) Court's Construction

In light of the intrinsic evidence, the term **"offer[ing]"** will be given its **plain and ordinary meaning.**

### 6. "plan"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "plan" | plain meaning | "one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client" |

### a) The Parties' Positions

The parties dispute whether the term "plan" should be construed as "one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client," as Defendants propose. Plaintiffs contend that the specification clearly and unambiguously provides that "[t]he term 'plan' is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client." (Dkt. No. 385 at 20) ('938 Patent 7:3–7). According to Plaintiffs, "plan" is used in its broad sense, and, as an example, may "include a plan which may incorporate . . . products or services . . . ." (*Id.*) Plaintiffs further argue that the specification's explanation that a plan "may incorporate one or more financial products [or] services" makes sense in the context of the patent claims. (*Id.*at 21.) Plaintiffs argue that claim 22 of the '434 Patent expressly claims "at least one plan comprising a plurality of the financial products," whereas claim 27 of the '632 Patent makes no reference to "financial products," but instead only requires that "the plan information include[] a plurality of products." (*Id.*)

Plaintiffs further contend that the specification's explanation of "plan" is consistent with dictionary definitions. (*Id.*) (citing Dkt. No. 385-27 and Dkt. No. 385-28). Plaintiffs further argue that the specification's explanation of a "plan" undermines any notion that "the specification . . . contain[s] 'expressions of manifest exclusion or restriction, representing a clear disavowal'" of "plans" beyond simply "financial products or services." (*Id.* at 22) (quoting *Retractable Techs., Inc. v. Becton*, 653 F.3d 1296, 1306 (Fed. Cir. 2011)).

Defendants respond that the specification makes clear that a plan incorporates one or more financial products. (Dkt. No. 411 at 22–23) (quoting '744 Patent at 6:50–54) ("The term 'plan' is used in its broad sense to include a plan which may incorporate one or more financial

products and one or more financial services aimed at achieving a particular objective or set of objectives of the client."). Defendants argue that the definition provided references "financial products," not just "products." (*Id*. at 23.) Defendants further argue that the definition of "plan" is contained within the paragraph defining "financial products." (*Id*.) (citing '744 Patent at 6:36–57). Defendants contend that the definition is directly preceded by the definition of financial products and is followed by a clarification that the term "financial products" can refer to financial products, services, or plans. (*Id*.) (citing '744 Patent at 6:36–57). According to Defendants, the specification contemplated only financial products or services. (*Id*.)

Defendants further argue that even if the explicit definition of "plan" were broad enough to encompass nonfinancial products, the '632 Patent specification limits the claims to "financial products" through repeated references to "the present invention" in the same way as the '317 Patent. (*Id*.) (citing '632 Patent at 1:32–34, 3:53–4:3, 16:16–17:67, Figures 5–9, 14). Defendants also argue that the title of the '632 Patent is "System, Method, and Computer Program Product for Selecting and Presenting Financial Products and Services." (*Id*. at 24.)

Plaintiffs reply that the specification provides only that a "plan" "may incorporate . . . financial products . . . ." (Dkt. No. 419 at 6) (citing '938 Patent at 7:3–7). Plaintiffs argue that Defendants' quotes from the '632 Patent are the same as those used for the term "product," and what Defendants quote as the "invention" is simply an embodiment. (*Id*.) (citing '632 Patent at 6:4–21). Plaintiffs further argue that Defendants provide no response to the fact that the "plan" expressly comprises a financial product in some claims, but not in others. (*Id*.) (citing '434 Patent at claim 22; '632 Patent at claim 27). Plaintiffs further contend that the specifications describe instances where the plan is separate from the financial product. (*Id*.at 6–7) (citing '434 Patent at 9:44–46).

For the following reasons, the Court finds that the term **"plan"** should be construed to mean **"one or more financial products or services aimed at achieving one or more objectives of the client."**

### b) Analysis

The term "plan" appears in asserted claims 22, 49, 69, 73, 74, 101, 122, and 127 of the '434 Patent; and asserted claims 1, 3, 4, 7, 17, 22, 27, 28, 29, and 31 of the '632 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The specification states that "the term 'plan' is used in its broad sense to include a plan which may incorporate one or more financial products and one or more financial services aimed at achieving a particular objective or set of objectives of the client." '744 Patent at 6:50–54. The specification further states that "[f]or convenience and ease of explanation, the term 'financial products' as used herein below may refer to financial products and/or financial services and/or financial plans, and combinations of these." '744 Patent at 6:54–57.

The Court finds that both of these definition reference "financial products," not just "products." The Court further finds that the context of where the definition occurs provides insight on the meaning of "plan." Specifically, the definition of "plan" is contained within the paragraph defining "financial products." '744 Patent at 6:36–57. The definition is preceded by the definition of financial products and is followed by a clarification that the term "financial products" can refer to financial products, services, or plans. '744 Patent at 6:36–57. Accordingly, the Court finds that one of ordinary skill in the art would understand plan to mean "one or more financial products or services aimed at achieving one or more objectives of the client."

Regarding Plaintiffs argument that the recited "plan" can include any plan, the Court disagrees. For the same reasons discussed above, the Court finds that the '632 Patent

specification limits the claims to "financial products" through repeated references to "the present invention" in the same way as the '317 Patent. '632 Patent at 1:32–34, 3:53–4:3, 16:16–17:67, Figures 5–9, 14. Accordingly, the Court rejects Plaintiffs' interpretation that the plain and ordinary meaning of "plan" can mean any plan. Finally, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c)  Court's Construction

In light of the intrinsic and extrinsic evidence, the Court construes the term **"plan"** to mean **"one or more financial products or services aimed at achieving one or more objectives of the client."**

### 7.  "variable information"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
| --- | --- | --- |
| "variable information"[4] | plain meaning | "content that is selected for a particular client using decision information and inserted at a predetermined location" |

---

[4]      Defendants contend that Plaintiffs agreed that the terms "customized section," "customized specific content," "personalized content," "variable content data," and "variable data" "can be addressed as a group" along with "variable information." (Dkt. No. 411 at 26) (citing Dkt. No. 317-1 at 11). Defendants argue that each of these terms is used within the context of their respective claims in the same manner as "variable information" is used in the specification and claims and, thus, should receive the same construction. (*Id.*) Defendants also argue that the phrase "information relating to an offering for one or more financial products or services" or "plan information" are synonymous with "variable information." (*Id.* at 27.) Defendants request that that each of these terms be given the same construction as "variable information." (*Id.*)

Plaintiffs respond that just because the terms may be addressed as a group does not mean they all mean the same thing. (Dkt. No. 419 at 7 n.3.) Plaintiffs further argue that Defendants waived construction of other so-called "related" terms as they were not identified in their Notice of Election of Terms as required by the Court's Order. (*Id.*) (citing Dkt. No. 347).

At this point, the Court is not convinced that all of the terms listed should be construed the same. To the extent that one or more of these terms require construction, the parties are directed to the procedure stated in the Court's Order Regarding Claim Construction Briefing Schedule (Dkt. No. 403.)

### a) The Parties' Positions

The parties dispute whether the term "variable information" should be construed as "content that is selected for a particular client using decision information and inserted at a predetermined location," as Defendants propose. Plaintiffs contend that the applicant used the term "variable information" consistent with its plain and ordinary meaning. (Dkt. No. 385 at 22.) Plaintiffs argue that the claims recite that the "variable information" is information that may vary among clients. (*Id*.) (citing '434 Patent at claim 69; '744 Patent at claim 1). Plaintiffs further argue that the claims make clear that the term was meant to have a broad scope. (*Id*.) (citing '744 Patent at 29:23, 29:43–47, 30:7, 30:33; '375 Patent at 31:46–32:12).

Plaintiffs also contend the specification confirms that "variable information" may "vary from client . . . to client," and may "take a number of different forms." (*Id*. at 22–23) (quoting '938 Patent 6:43–55). Plaintiffs further argue that Defendants add additional limitations requiring the information to include "content that is selected for a particular client," content that is selected "using decision information," and content that is "inserted at a predetermined location." (*Id*. at 23.) Plaintiffs argue that the actual claim language does not include these requirements. (*Id*.). Plaintiffs also argue that the requirement that the "variable information" must be selected "using decision information" violates the rule against limiting claims to a preferred embodiment. (*Id*.) Finally, Plaintiffs argue that the phrase "predetermined location" appears nowhere in the patents, and that the specification never limits the "variable information" to any particular location. (*Id*.)

Defendants respond that the specification defines a series of related "variable" terms, including "variable information," and that their construction is taken from this explicit definition. (Dkt. No. 411 at 25) (quoting '744 Patent at 6:23–35). According to Defendants, the specification affirms that the variable information: (1) is selected for a particular client using

decision information, and (2) inserted at a predetermined location. (*Id.*) (quoting '744 Patent at 12:24–26, 22:26–29, 9:4–11). Defendants further argue that the "inserted" language in their construction captures the disclaimer made in the file history that information contained in two different marketing materials that varies is not the claimed "variable information." (*Id.*) (citing Dkt. No. 411-2 at 6 ('599 Patent FH, Feb. 19, 2009, Response)) ("Varying information is <u>not</u> the same as variable information as claimed.") (emphasis in original).

Defendants argue that in distinguishing the prior art De Lapa reference, the applicant argued that even though the coupons included different text, "De Lapa's method does not use decision information to determine any variable information for any given coupon" because "De Lapa's method uses decision information to assign the pre-defined coupons to be printed for a particular customer." (*Id.* at 26) (quoting Dkt. No. 411-19 at 5-6 ('599 Patent FH, May 5, 2008, Response)). Defendants further argue that the applicant subsequently explained that "<u>De Lapa</u> says <u>nothing</u> about tailoring an offer of a <u>single</u> coupon so that an offer can vary from person to person," and "the fact that some persons get a coupon for Brand X at a first face value, while others get another coupon for Brand X at a second higher face value," is not sufficient to meet the claim language because "these are clearly <u>two different coupons</u> in <u>De Lapa</u>, and <u>not</u> a single coupon presented in two different ways." (*Id.*) (quoting Dkt. No. 411-20 at 39-40 ('599 Patent FH, May 22, 2006, Response at 38–39)) (emphasis in original).

Plaintiffs reply that "variable information" is simply information that "may vary" and "take a number of different forms . . . ." (Dkt. No. 419 at 7.) Plaintiffs argue that the intrinsic record does not support Defendants' requirements of "select[ion] for a particular client," "using decision information," or placing the variable information at a "predetermined location." (*Id.*) Plaintiffs contend that there are no claims that include "variable information" that refer to using

decision information, and any disclosure of that concept in the specification is related to embodiments. (*Id*.) (citing '938 Patent at 10:20–23). Plaintiffs further argue that "predetermined location" also is never mentioned in the intrinsic record. (*Id*.) Plaintiffs contend that the specification refers to the different terms "variable" and "variable portion" that "in a sense serve[] as a location marker." (*Id*.) (citing '938 Patent at 6:48–49).

Finally, Plaintiffs argue that Defendants' citations to the prosecution history do not show that the applicant clearly and unambiguously said that "variable information" had to be chosen in some particular way or put at a predetermined place. (*Id*.) Plaintiffs argue that Defendants concede that the applicant just "explained that simply selecting from among pre-existing advertising messages was not creating variable information." (*Id*.) (quoting Dkt. No. 411 at 18). Plaintiffs argue that information that was "the same for each person" is not variable. (*Id*.)

For the following reasons, the Court finds that the term **"variable information"** should be given its **plain and ordinary meaning.**

### b) Analysis

The term "variable information" appears in asserted claims 69 and 122 of the '434 Patent; asserted claim 1, 2, 3, 5, 25, 28, 29, and 36 of the '744 Patent; and asserted claims 37 and 123 of the '375 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same meaning in each claim. The Court further finds that the term "variable information" is unambiguous, is easily understandable by a jury, and requires no construction. For example, claim 69 of the '434 Patent recites that the "variable information may vary among clients being offered a particular financial product or plan relating thereto." Likewise, claim 1 of the '744 Patent recites that the "variable information varies from one client to another client." This is consistent with the plain and ordinary meaning that "variable information" is information

that may vary.

Regarding the terms "variable," "variable portion," and "variable information," the specification states the following:

> Each client communication according to the invention includes at least one "variable." A "variable" as the term is used herein, which also is referred to as a "variable portion," refers to a portion of a client communication which may vary from client communication to client communication. The variable in a sense serves as a location marker in the client communication, at which location the system and method according to the invention insert or provide certain "variable information" selected by the system and method. The variable information, which may take a number of different forms, is selected using the decision information so that it is appropriate for, and to a certain extent individualized for, a particular client.

'938 Patent at 6:43-55. As stated above, the specification indicates that "variable information" "may take a number of different forms," and how it is selected and inserted is not a limitation of the variable information, but instead refers to the decision information and the form of the client communication. Specifically, Defendants contend that variable information has two characteristics: (1) it is selected for a particular client using decision information, and (2) it is inserted at a predetermined location. The Court finds that these are not characteristics of "variable information," but instead are unwarranted limitations. In other words, "selecting" and "inserting" are not characteristics of the recited "variable information."

For example, the specification states that "[t]he decision information generally will comprise criteria or conditions used for the selection of variable information." '938 Patent at 13:33–35. As this indicates, the selection criteria is a characteristic of the decision information, and not the "variable information." Similarly, where the "variable information" is inserted is a characteristic of the client communication, and not the "variable information." For example, the specification states that "[t]he variable in a sense serves as a location marker in the client communication, at which location the system and method according to the invention insert or

provide certain 'variable information' selected by the system and method." '938 Patent, 6:48-51. Here the specification distinguishes between "variable" and "variable information," and notes that it is the "variable" that serves as one location marker, and not the "variable information." Accordingly, the Court rejects Defendants construction.

Regarding Defendants prosecution history argument, the Court finds that the applicant argued that "De Lapa says nothing about tailoring an offer of a single coupon so that an offer can vary from person to person." (Dkt. No. 411-20 at 39 ('599 Pat. FH, May 22, 2006, Response)). The applicant continued, "[i]n contrast, in the present invention, the ability to customize and personalize such offerings if need be is a significant advantage." (*Id.* ('599 Pat. FH, May 22, 2006, Response)). The Court finds that this is not a clear and unambiguous disclaimer that would require "variable information" to be selected in a particular way or inserted at a predetermined place. (Dkt. No. 419 at 7.) Instead, the Court finds that the applicant argued that information that was the same for each person is not variable. In contrast, the plain and ordinary meaning of "variable information" indicates that it is information that varies. Accordingly, the Court finds that the term is unambiguous, is easily understandable by a jury, and requires no construction.

### c) Court's Construction

In light of the intrinsic evidence, the term **"variable information"** will be given its **plain and ordinary meaning.**

### 8. "each"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "each" | plain meaning | "every one of two or more considered individually or one by one" |

### a) The Parties' Positions

The parties dispute whether the term "each" should be construed as "every one of two or

more considered individually or one by one," as Defendants propose. Plaintiffs argue that there is no need to construe the word "each." (Dkt. No. 385 at 24.) Plaintiffs contend that Defendants' proposal replaces an easily understood non-technical term with a more verbose, potentially confusing phrase intended to express the same meaning. (*Id*.) Plaintiffs argue that the applicant never expressed any special definition of "each." (*Id*.)

Defendants respond that Plaintiffs fail to identify an actual fault with their construction, and instead only argue that construction is unnecessary. (Dkt. No. 411 at 27.) Defendants contend that construction is necessary to prevent Plaintiffs from expanding the scope of the claims to include situations where products or services are not selected on an individual basis. (*Id*.) Defendants argue that their construction is consistent with the specification and a prior construction of "each" in another case to mean "every one of two or more considered individually or one by one" (*Id*.) (citing *Freedom Wireless, Inc. v. Alltel Corp.*, 2008 WL 4647270, at *12 (E.D. Tex. Oct. 17, 2008)).

Defendants further argue that the intrinsic record consistently indicates that the invention requires an individualized assessment to determine the product to offer a particular client. (*Id*. at 28) (citing '434 Patent at 4:12–14, Figures 6–9). Defendants also argue that in allowing several of the Asserted Patents, the PTO stated its understanding that "[t]he present invention is directed to methods and systems for considering client and financial data, determines whether to offer a product for a specific entity, outputs and offer for the determined product, and then moves on to the next client, these steps are performed without input from an agent." (*Id*.) (quoting Dkt. No. 411-3 through Dkt. No. 411-8 ('317, '599, '867, '230, '632, and '435 Patents. FH, Aug. 15, 2012, Feb. 17, 2010, Apr. 27, 2010, June 21, 2010, Oct. 16, 2013, and Apr. 7, 2014, Notices of Allowance at 2). Finally, Defendants contend that extrinsic dictionary definitions are in accord

with their construction. (*Id.*) (citing Dkt. No. 411-21 (The Random House Webster's College Dictionary); Dkt. No. 411-22 (Webster's New World College Dictionary)).

Plaintiffs reply that Defendants admit that their proposed construction is motivated by their non-infringement theory. (Dkt. No. 419 at 7) (citing Dkt. No. 411 at 19). Plaintiffs argue that claim construction "begins and ends" with the actual language of the claims, and that Defendants' non-infringement theory is out of place, especially in the context of a term as simple as "each." (*Id.*) (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d. 1243, 1248 (Fed. Cir. 1998)).

For the following reasons, the Court finds that the term **"each"** should be given its **plain and ordinary meaning**.

### b) Analysis

The term "each" appears in asserted claims 2, 14, 21, 22, 41, 47, 48, 49, 66, 68, 93, 95, 119, and 121 of the '434 Patent; asserted claims 1, 18, 52, 184, and 226 of the '938 Patent; asserted claims 9, 27, 28, 94, and 113 of the '375 Patent; asserted claims 1, 8, 21, 22, 28, 39, 60, 70, and 113 of the '366 Patent; asserted claims 1, 25, and 52 of the '317 Patent; asserted claims 1 and 17 of the '632 Patent; and asserted claims 1, 9, 15, 16, and 30 of the '435 Patent. The Court finds that the term is used consistently in these claims and is intended to have the same meaning in the claims. Having reviewed the intrinsic evidence, the Court finds that the term "each" is unambiguous, is easily understandable by a jury, and requires no construction. Defendants' construction replaces this easily understandable word with a potentially confusing phrase intended to express the same meaning. Therefore, the term will be given its plain and ordinary meaning.

Defendants contend that their construction is necessary to ensure that Plaintiffs cannot

expand the scope of the claims to include situations where products or services are not selected on an individual basis. The Court finds that the claim language provides the context for the term "each." For example, claims 1, 2, 14, 21, and 22 of the '434 Patent recite "each of the clients." The claim language is not confusing and the term "each" does not require construction.

Defendants also argue that their construction is consistent with the specification. The Court agrees that the Asserted Patents explain that "the invention uses client information from a client to automatically select and present financial products appropriate for the client." *See, e.g.,* '434 Patent at 4:12–14. The Court also agrees that the disclosed embodiments consistently indicate a process that is repeated individually for each customer. *See, e.g.*, '434 Patent Figures at 6–9 (each beginning with step of "retrieves next [prospective] client record"). That said, the Court finds that the plain meaning of the term "each," and the surrounding claim language, properly addresses the parties' dispute. The applicant did not provide a special definition of "each" and Defendants' construction is more confusing than helpful. *Packless Metal Hasen Inc. v. Extek Energy Equip.*, 2013 U.S. Dist. LEXIS 8821, *17 (E.D. Tex. 2013) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."). Therefore, the term will be given its plain and ordinary meaning. Finally, the Court has considered the extrinsic evidence submitted by the parties, and given it its proper weight in light of the intrinsic evidence.

### c) Court's Construction

In light of the intrinsic and extrinsic evidence, the term **"each"** will be given its **plain and ordinary meaning**.

### 9. "response"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "response" | plain meaning | "communication from a client back to the sender of an original client communication that includes a selection from response options presented in the original client communication" |

### a) The Parties' Positions

The parties dispute whether the term "response" should be construed as "communication from a client back to the sender of an original client communication that includes a selection from response options presented in the original client communication," as Defendants propose. Plaintiffs contend that a response is simply a communication that responds to another communication. (Dkt. No. 385 at 24.) Plaintiffs argue that the applicant expressly adopted the plain meaning of the term. (*Id.*) (quoting '938 Patent at 7:56–58) ("'Response' refers to a communication from a client in response to an original 'client communication' sent to that particular client or a reply communication.").

Plaintiffs further argue that Defendants limit a "response" to a "communication . . . that includes a selection from response options presented in the original client communication." (*Id.*) Plaintiffs argue that Defendants ignore the express definition of "response," in favor of preferred embodiments. (*Id.*) (citing '938 Patent at 7:58–61). Plaintiffs further argue that the doctrine of claim differentiation confirms that "responses" should not be construed as requiring the optional limitation "selection from response options." (*Id.*) Plaintiffs contend that independent claim 52 of the '938 Patent refers to "responses . . . to said communications," while dependent claim 79 adds that "said communications . . . include[] one or more response options." (*Id.*) According to Plaintiffs, there is a presumption that the claim term "responses . . . to said communications" in claim 52 is not limited to responses to "communications [that] include[]one or more response

options." (*Id*. at 25–26.)

Defendants respond that their proposed construction is taken from an explicit definition in the specification. (Dkt. No. 411 at 29.) Defendants argue that the patent explicitly states "'[r]esponse' refers to a communication from a client in response to an original 'client communication' sent to that particular client or a reply communication. The response includes a selection of response options . . . ." (*Id*.) (quoting '938 Patent at 7:56–59). Defendants contend that Plaintiffs quote each portion of this two-sentence definition separately, but fail to acknowledge that the two sentences are part of a single statement found within the glossary section of the specification. (*Id*.) According to Defendants, nothing in the specification suggests that any portion of this definition is restricted only to a preferred embodiment. (*Id*.)

Defendants further argue that consistent with the prosecution history, their construction also makes clear that the responsive communication goes back to the sender of the original communication. (*Id*. at 30) (citing Dkt. No. 411-23 at 60 ('938 Patent FH, June 6, 2003, Response)). Defendants further argue that consistent with the specification, their construction makes clear that any selected response options must be selected from the options presented in the original communication. (*Id*.) (citing '938 Patent at 31:2–17, 34:25–27). Defendants also contend that Plaintiffs claim differentiation argument fails because claim 79 requires that both original communications and replies include response options. (*Id*.) According to Defendants, claim 79 is consistent with the glossary's requirement that the response select one of the response options provided by the original communication. (*Id*.) Defendants contend that claim 79 simply requires that both the "communications" and "replies" present response options, which narrows the scope of replies in claim 52. (*Id*. at 30-31.)

Plaintiffs reply that the specification defines "response" consistent with its plain meaning.

(Dkt. No. 419 at 8) (quoting '938 Patent at 7:56–58). Plaintiffs argue that Defendants mischaracterize the "response option" embodiment as part of the definition. (*Id*.) Plaintiffs further argue that Defendants arbitrarily select that embodiment while ignoring others (e.g., "tagged with a label"). (*Id*.) According to Plaintiffs, the arbitrary nature of Defendants' construction undermines their proposal. (*Id*.)

For the following reasons, the Court finds that the term **"response"** should be given its **plain and ordinary meaning.**

### b) Analysis

The term "response" appears in asserted claims 1, 18, 19, 52, 184, 192, 201, 213, 220, 226, 241, 253, and 260 of the '938 Patent; asserted claims 2, 8, 28, and 31 of the '744 Patent; and asserted claims 11 and 30 of the '184 Patent. The Court finds that the claim language provides context for the term "response," and the term is unambiguous, is easily understandable by a jury, and requires no construction. For example, claim 52 recites "delivering each communication to a respective one of the plurality of consumer entities; receiving one or more responses from at least some consumer entities, said responses comprising nonpurchase requests and being in response to communications." Similarly, claim 8 of the '744 Patent recites "processing a response from at least one of said certain clients to said first electronic communication." As recited in the claims, a response is a communication from a client in response to a communication sent to the client/entity. This is the plain and ordinary meaning of the term "response" and is consistent with the specification. Specifically, the specification states the following:

> "Response" refers to a communication from a client in response to an original "client communication" sent to that particular client or a reply communication. The response includes a selection of response options, for example, "buy," "more information," "different amount," etc., depending upon the nature of the product

or service being marketed. Of particular interest are responses that select nonpurchase type options (i.e. ones that do not include an order to buy) because, as explained above, traditional mass marketing generally does not permit and generally does not cope with these types of responses. To facilitate the automatic reply scheme of the invention, each response is tagged with a label. Responses can be received by a variety of transmission methods, e.g. electronically from call centers, users of the system, faxes, internet, etc.

'938 Patent at 7:56-8:3. As discussed, the specification finds that a person of ordinary skill in the art would understand "response" to mean "communication from a client in response to an original client communication sent to that particular client or a reply communication." Again, the Court finds that this is the plain and ordinary meaning of "response."

The Court further finds that this is consistent with the argument during prosecution that "the invention is directed to conversational threads having the following sequence: Communication Response Reply" in which "the customer reads a 'communication' [and] sends a 'response' to the system." (Dkt 411-23 at 60 ('938 Pat. FH, June 6, 2003, Response)). The applicant further included the following picture to illustrate a conversational thread.

Communication
Response
Reply
*
*
*

(*Id.*)

Regarding Defendants' construction, Plaintiffs contend that including a "selection of response option" is limiting the term to preferred embodiments. The Court agrees. The portion of the specification quoted above appears in the section title "Detailed Description of the Preferred Method and Embodiment." Thus, the claims are not limited to embodiments that requires the

"response" to include "response options." Indeed, independent claim 52 of the '938 Patent refers to "responses . . . in response to communications," while dependent claim 79 adds that "said communications and replies includes one or more response options." Accordingly, the Court finds that "responses" are not limited to communications that include "response options."

Finally, Defendants note that some of the asserted claims recite communications that are "in response to" or "responding to" a prior communication. (Dkt. No. 411 at 29 n.20) Defendants argue that these are merely alternative ways of referring to a "response," and therefore all of these terms should be accorded a consistent meaning. (*Id.*) The Court agrees that these terms should be given the same meaning. However, it is not the meaning proposed by Defendants. Instead, to the extent that these terms require construction, the Court finds that they should be given their plain and ordinary meaning.

### c) Court's Construction

In light of the intrinsic evidence, the term **"response"** will be given its **plain and ordinary meaning.**

### 10. "means for inputting"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for inputting"<br><br>'434 Patent claims 1, 14, 21, 22, 28 | **Function:** inputting<br>**Structure:** disk drive, tape drive, optical scanner, bar code reader, or other scanning technology, modem, keyboard, mouse, light pen, trackball or similar pointing device, voice recognition technology, networked nonresident database, and equivalents thereof | **Function:** inputting<br>**Structure:** keyboard, mouse, light pen, trackball, tape drive, bar code readers, diskette drives, modem, scanner, or voice recognition, in conjunction with a processor performing the specific algorithm disclosed in Fig. 4 – namely, reading the input data from media and storing in temporary storage; converting data to compatible format for the system; tagging and identifying client records; and reading into the database module |

### a) The Parties' Positions

The parties agree on the claimed function but disagree on the corresponding structure. Plaintiffs contend that Defendants fail to account for "other scanning technology" and "similar pointing device[s]" like a mouse, light pen, or trackball, which are expressly disclosed in the specification. (Dkt. No. 385 at 26) (quoting '434 Patent at 8:14–17, 6:12–13, 6:46–47, 6:49–51, 8:9–12, Figures 1 & 4). Plaintiffs further argue that Defendants' construction also impermissibly injects the algorithm of Figure 4 into the claimed structure. (*Id*. at 27.) Plaintiffs contend that Figure 4 discloses an algorithm for the "data input module," which provides the structure for functions beyond the claimed function relevant here, namely "inputting." (*Id*.) (citing '434 Patent at 5:1–3). Plaintiffs argue that it is improper to expand the "means for inputting" to include means for "converting data" or "tagging records" or the like, especially when Defendants concede that the sole function of this claim element is "inputting." (*Id*.)

Defendants respond that their construction appropriately identifies the algorithm required to perform the claimed function in view of the prosecution history and the plain language of the claims. (Dkt. No. 411 at 34.) Defendants argue that claim 1 of the '434 Patent requires the inputting means be further limited to "automatically inputting" information into client records.[5] (*Id*.) Defendants argue that the inputting means can therefore not be performed by the devices identified by Plaintiffs and require additional computer-implemented means to perform the function. (*Id*.) According to Defendants, the specification must disclose an algorithm clearly linked to this function. (*Id*.) Defendants contend that the only algorithm disclosed in the specification of the '434 Patent clearly linked to the "means for inputting" is the algorithm disclosed in Figure 4. (*Id*.)

---

[5] Defendants also contend that claims 21, 22, 25, and 28 were amended during the first reexamination of the '434 Patent to include similar limitations. (Dkt. No. 411 at 34.)

Defendants further argue that the prosecution history is consistent with Defendants' construction. (*Id.*) Defendants contend that during reexamination of the '434 Patent, the applicant further differentiated the claimed invention from the Frenkel reference on the grounds that "Frenkel fails to disclose that the client records are input ' . . . **automatically . . . without human intervention** between input of respective client records . . . .'" (*Id.*) (quoting Dkt. No. 411-25 at 4 ('498 Patent 1st Reexam, Feb. 21, 2006 Response)) (emphasis in original). Defendants further argue that the PTO allowed the claims based on the applicant's express limitations of the "inputting means," including the amendment that required automatic input of the client information without human intervention. (*Id.* at 35.) Defendants contend that the structures identified by Plaintiffs are not capable, on their own, of automatically inputting as required by the claim language. (*Id.*)

Plaintiffs reply that the agreed function is "inputting," not "automatic inputting," as Defendants suggest. (Dkt. No. 419 at 8.) Plaintiffs contend that "automatic inputting" is confined to automatically inputting "client records," and several claims make no reference to automatic inputting whatsoever. (*Id.*) (citing '434 Patent at claims 14, 19, & 20; '938 Patent at claims 107 & 111). Plaintiffs contend that the specification makes clear how the agreed function of "inputting" is accomplished, namely by means of a networked database, modem, keyboard, etc. (*Id.*) Plaintiffs argue that although the system uses a processor, no special algorithm is required for inputting. (*Id.*)

### b)  Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The parties

have identified the function as "inputting." The Court finds that the parties identified function lacks the specificity required by the claims. Specifically, asserted claims 14, 21, and 22 of the '434 Patent generally recite inputting: (1) client information; (2) information about financial products, life insurance products and/or plans; and (3) decision criteria. Moreover, as discussed below, the prosecution history requires the client information to be "automatically" inputted. Accordingly, the Court finds that this mean-plus-function phrase includes two functions. The first being "means for inputting the client information," and the second being "means for inputting information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria."

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. The parties dispute whether the structure includes a processor and, therefore, should also include the algorithm of Figure 4 in the structure. For mean-plus-function limitations implemented by computer software, the corresponding structure described in the patent specification must include an algorithm for performing the function. *WMS Gaming Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). In other words, the corresponding structure is not a general purpose computer but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Here, the specification discloses that the algorithm for performing the function is illustrated in Figure 4. Specifically, the specification states that "[a]n example of the organization and task flow of the data input module shown in FIG. 4." '434 Patent at 8:9–10. The specification further states the following:

> The data input module of this embodiment and method inputs data into the system from one or more of the input devices for the system, such as modem 20,

tape drive 22, or bar code reader 24.

        With further reference to FIG. 4, as data is inputted [sic], the data input module stores it in a temporary storage area within processor 12. If necessary or appropriate, the data is converted to a format compatible with the system. For example, as is known in the database arts, it is sometimes necessary to import or export files to convert one database format to a pre-defined database structure. In this embodiment, the data input module also may tag and identify client records as they are inputted, and perform general and routine "house keeping" tasks on the data. Once these tasks have been performed by the data input module, the properly-formatted client information is transferred to the database module.

'434 Patent at 8:38–61. As indicated above, the specification includes a processor in the structure of the inputting means, and further discloses the algorithm that performs the function in Figure 4. However, the Court finds that the algorithm does not need to include all of the steps of Figure 4, as Defendants contend. Instead, depending on the corresponding function, the processor is only required to be programmed to perform: (1) reading or receiving information; (2) storing information in temporary storage area of the processor; and (3) transferring the information to a database. Indeed, the specification indicates that the steps of "converting data to compatible format for the system" is only included "[i]f necessary or appropriate," and that "the data input module also *may* tag and identify client records as they are inputted." '434 Patent at 8:51–58 (emphasis added). Neither of these steps are required in performing the recited function. Accordingly, the Court will not include these steps in the algorithm.

        Turning to the function of "means for inputting the client information," the Court finds that the corresponding structure is modem, tape drive, disk drive, diskette drive, non-resident database and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) reading client information from the media; (2) storing the client information in temporary storage; and (3) transferring the client information to a database. As discussed above, the specification identifies a processor in Figure 1 programmed to perform the related steps of Figure 4. Referring to Figure 1, the specification identifies the following media structure for

inputting information:

> The means of inputting may vary depending on the format in which the information is available. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. Diskette drives (not shown), for example, as would come as standard equipment with the types of processors noted above also may be used. In some instances, bulk lists of client records may be available by tape, in which case in which case tape drive 22 may be used. Some records are available on non-resident databases. This is increasingly the case as online networks such as the Internet gain widespread use and acceptance. In such instances, prospective client information may be received via modem 20.

'434 Patent at 7:58-8:3. The corresponding media structure is also identified in Figure 4 that states the media formats include "Modem Transfer, Tape, and Diskette, Etc." '434 Patent at Figure 4 ("Download Data" block). Thus, the Court finds that the structure includes at least these elements.

During the first reexamination, the applicant further clarified that the "means for inputting the client information" is limited to this structure because a simple keyboard entry system was not enough. Specifically, the applicant argued that "it is incontrovertible that the client information in Frenkel [the prior art] is only fed <u>manually</u> (i.e., by a human operator using a keyboard or scanner 1 or the like) into the computer system 2 shown in Figure 1." (Dkt. No. 411-25 at 5 (Feb. 21, 2006 OA Response)) (emphasis in original). The applicant continued that "Frenkel clearly requires some kind of human intervention in order to get individual client records into computer 2 so that they can be processed to generate reports. At a minimum, Frenkel says absolutely nothing about " . . . automatically inputting . . . ." (Dkt. No. 411-25 at 5 (Feb. 21, 2006 OA Response)).

The applicant further argued that this distinction was crucial because:

> There can be no meaningful debate that Frenkel clearly requires human intervention (" . . . individual consideration") to review the reports to determine the cause of any input errors. Thus any fair and reasonable reading therefore of Frenkel reveals that [it] is clearly not operating " . . . without human intervention" to automatically input client records as set out in claims 1, 2.

The distinction is crucial because, as claims 1, 2 specify, there must be at least some inputting that is <u>automatically</u> done " . . . without human intervention." This is a negative limitation which cannot be ignored for purposes of patentability and must be respected so long as it is clear.

(Dkt. No. 411-25 at 6 (Feb. 21, 2006 OA Response)) (emphasis in original). The applicant concluded that "[i]t should be apparent that automatic means for inputting, which can be from a disk drive (claim 3), a tape drive (claim 4), a modem (claim 7) are not made obvious by a simple keyboard entry system such as shown in Frenkel. The latter is clearly not an input means which is 'automatically inputting' client records as set out in claim 1." (*Id.* at 13 (Feb. 21, 2006 OA Response)).

Finally, the prosecution history indicates that the PTO relied on the applicant's statement of requiring automatic input without human intervention in allowing the claims. Specifically, the examiner states that "[c]laims 1, 2, 8, 15, 16, 21, 22, 23, 25, 28, 35, 42, 43, 46, 48, 49, 55 and those that depend therefrom are confirmed because, but not necessarily limited as the only reason, the prior art patent and printed publications within this reexamination proceeding fail to disclose, teach or suggest, singly or in combination, the inputting means automatically inputting the plurality of client records without human intervention between input of the respective client records as the Patent Owner has argued in the remarks within this reexamination proceeding which is also incorporated herein as part of the reason for confirmation." (Dkt. No. 411-26 at 6 ('434 Pat. 1st Reexam. FH, Apr. 3, 2007, Reasons for Allowance).

Given the prosecution history above, the Court finds that the applicant clearly and unambiguously disclaimed an apparatus that uses only a manual entry system to input client information. Accordingly, the Court agrees with Defendants that the corresponding structure for the "means for inputting the client information" element is not "a simple keyboard entry system such" as shown in the prior art. Instead, it is the identified media operating in conjunction with a

processor programmed to perform the related steps identified in Figure 4.

Turning to the function of "means for inputting information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria," the Court finds that corresponding structure is basically the structure identified by Plaintiffs, in conjunction with a processor programmed to perform the steps of: (1) receiving or reading information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria from an input device or media; (2) storing the [information], [plans], and decision criteria in temporary storage; and (3) transferring the [information], [plans] and decision criteria to a database. As discussed above, the specification identifies the processor programmed to perform the steps of Figure 4. The remaining structure is identified in the specification as follows.

The specification states that embodiments include "a computer system using a networked client-server database system architecture with a number of computer nodes or computer workstations." '434 Patent at 6:3–5. The specification further states that "each of the individual computer workstations or nodes within the system includes a processor 12, a display 14, a keyboard 16, a mouse 22, light pen, or similar pointing device 18, a modem 20, a tape drive 22, and a bar code reader 24." '434 Patent at 6:10–14, Figure 1. The specification further refers generally to "scanning technology," "scanners such as those commercially available for use with processor 12," and "optical scanners. '434 Patent at 8:14–17, Figure 4. The specification also discusses voice recognition technology. '434 Patent at 8:21–26. The Court further finds that these structures are linked to the claimed function. '434 Patent at 6:49–51 ("The mouse, light pen, track ball or similar pointing device . . . comprise[] means for inputting").

The parties generally agree that these are the corresponding input devices. However, unlike the "means for inputting the client information" element, the Court finds that the "means

for inputting . . . information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria" may include manual and/or automatic inputting. Indeed, the specification explicitly states that "data may be entered manually or automatically. For example, information may be entered using scanning technologies." '433 Patent at 8:9–12. The Court does not find, and Defendants did not identify, any instance in the intrinsic record where the applicant distinguished the prior art based on a manual entry system as it relates to inputting information about life insurance/financial products, [plans] . . . and decision criteria. Accordingly, the Court agrees with Plaintiffs that "automatic inputting" refers to automatically inputting "client records," and does not limit the "means for inputting . . . information about life insurance/financial products, [plans] . . . and decision criteria"

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for inputting the client information"** as follows:

**<u>Function</u>: The Court finds that the function is inputting client information.**

**<u>Corresponding Structure</u>: The Court finds that the corresponding structure is modem, tape drive, disk drive, diskette drive, non-resident database, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) reading client information from the media; (2) storing the client information in temporary storage; and (3) transferring the client information to a database.**

The Court construes the phrase **"means for inputting . . . information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria"** as follows:

**<u>Function</u>: The Court finds that the function is inputting information about means for inputting . . . information about [financial products]/ [life insurance products], [a**

plurality of plans], and decision criteria.

**Corresponding Structure**: The Court finds that the corresponding structure is disk drive, diskette drive, tape drive, non-resident database, optical scanner, bar code reader, modem, keyboard, mouse, light pen, trackball, voice recognition technology, and equivalents thereof, in conjunction with a processor programmed to perform the steps of: (1) receiving or reading information about [financial products]/ [life insurance products], [a plurality of plans], and decision criteria from an input device or media; (2) storing the [information], [plans], and decision criteria in temporary storage; and (3) transferring the [information], [plans] and decision criteria to a database.

## 11. "means . . . for using"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means . . . for using"<br><br>'434 Patent claims 1, 14, 21, 22, 28 | **Function:** using the client information, [the life insurance products information]/[the financial products information including the non-price product information]/[the financial products information, the plans], and the decision criteria to select a subset of the [life insurance products]/[financial products]/[plans] for each of the clients appropriate for that client[, the subset of the plans including at least one plan comprising a plurality of the financial products]<br>**Structure:** network server processor specifically programmed to implement the virtual agent module disclosed in Fig. 5, 6, 7, 8, 9 or 9:46-14:6, and equivalents thereof | **Function:** AGREED<br>**Structure:** a general purpose computer depicted in Figure 1, as Network server 10 executing the specific algorithm disclosed in Figs. 5–9. The algorithm includes at least Steps A–I, depicted in Fig. 5: A. Run jobs in order of priority set by production and scheduling mode. B. Retrieve a set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records. C. Retrieve or otherwise receive a set of client records from the client database. D. Identify, evaluate, and analyze the needs of the client among other reasons for plan(s) and product(s) selection of a given. E. Analyze client information for that record, including demographic information. F. Use the analyzed client information and apply it against the decision making criteria. G. Select the product or products which satisfy the decision making criteria, drawing from the available product pool the most appropriate product to fit each plan selected as a candidate in Step F. H Decide on exact amount of coverage to offer for each plan, based on Steps D, E, and F above. I. Analyze the past of current performance on a real-time basis of various sale programs, including identifying on a real time basis who is buying on any geographic or demographic basis and further determining what the individual client is most likely to buy, making the end user aware of that fact, recommending changes, and implementing changes where possible |

### a) The Parties' Positions

The parties agree on the claimed function. The parties also agree that the specification

discloses algorithms that provide structure clearly linked to the claimed function, but disagree on

the scope of the structure. Plaintiffs contend that Defendants' construction is too limiting

because it would require an infringing system to execute each of the algorithms disclosed in

Figures 5–9, at least steps A–I of Figure 5, and analyze data on a real-time basis, determine what a client is most likely to buy, and recommend/implement changes. (Dkt. No. 385 at 29.) Plaintiffs argue that the claimed structure consists of a network server processor specifically programmed to implement the virtual agent module, and the specification makes clear that Figures 5-9 are merely "illustrative examples" of functions that can be performed by the module. (Dkt. No. 385 at 29) (citing '434 Patent at 9:66–10:2).

Plaintiffs further argue that Defendants' construction ignores disclosed methodologies and limits the selection merely to "select[ing] the product or products which satisfy the decision making criteria, drawing from the available product pool the most appropriate product to fit each plan selected as a candidate in Step F." (*Id*.) Plaintiffs also argue that Defendants' construction requires the "product fit each plan selected as a candidate in Step F," but many of the "means . . . for using" claims do not claim "plans," claiming instead "financial products." (*Id*.) (citing '434 Patent at 4:34–48, 4:64–67, 5:23–27). Plaintiffs also argue that Defendants' reference to "a general purpose computer" is improper. (*Id*.) Plaintiffs contend that the disclosed structure is not a general purpose computer, but a special purpose processor programmed to perform the disclosed algorithm. (*Id*. at 29-30.)

Defendants respond that Plaintiffs' proposed structure fails to "disclose an algorithm for performing the claimed function." (Dkt. No. 411 at 35.) Defendants contend that Plaintiffs' identified "Virtual Agent module" is not an algorithm expressed in "understandable terms." (*Id*.) Defendants argue that the '434 Patent states that the "Virtual Agent module" is part of the "core system" of the disclosed "software." (*Id*. at 36) ('434 Patent at 7:14–25). Defendants contend that their proposed structure identifies the algorithm steps clearly linked to the claimed function that are disclosed in the '434 Patent for the "Virtual Agent module." (*Id*.) Defendants note that

the specification states that "FIG. 5 is a flow chart diagram illustrating the Virtual Agent™ module of the preferred embodiment and method of the invention." (*Id.*) (quoting '434 Patent at 5:4–6). According to Defendants, the "means for using" terms are appropriately limited to the specific algorithm disclosed in Figures 5–9 of the '434 Patent. (*Id.*) Finally, Defendants argue that the '434 Patent describes a general purpose computer, not a "specially programmed network processor." (*Id.*) (citing '434 Patent at 6:1–7:13).

Plaintiffs reply that Defendants mischaracterize their proposal as vague by ignoring their reference to the "virtual agent module disclosed in Fig[s]. 5-9 or 9:46-14:6." (Dkt. No. 419 at 9.) Plaintiffs contend that their proposal ensures that the term includes all means for performing the function. (*Id.*) Plaintiffs argue that Defendants' construction limits the structure to certain disclosed means while ignoring others. (*Id.*) Finally, Plaintiffs argue that the specification discloses a "network server . . . [that] includes processor 12," and that "processor 12 has resident in its memory system computer software . . . . [that] includes . . . a Virtual Agent module," (*Id.*) ('434 Patent at 6:1–15, 7:14–32, Figure 1).

**b) Analysis**

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as "using the client information, [the life insurance products information]/[the financial products information including the non-price product information]/[the financial products information, the plans], and the decision criteria to select a subset of the [life insurance products]/[financial products]/[plans] for each of the clients appropriate for that client[,] the subset of the plans including at least one plan comprising a plurality of the financial products]." The Court agrees that this is the function recited in the claims.

Turning to the corresponding structure, the Court finds it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "Virtual Agent module." ('434 Pat. at 6:10–11, 7:14–25). Furthermore, the specification states that "FIG. 5 is a flow chart diagram illustrating the Virtual Agent™ module of the preferred embodiment and method of the invention." '434 Patent at 5:4–6. The specification also states that Figures 6–9 provide additional "specific examples" of the implementation of the algorithm disclosed in Figure 5. '434 Patent at 7:7–23. Accordingly, the Court turns to these flow charts to determine the steps the processor is programmed to perform.

As an initial matter, Plaintiffs contend that their construction ensures that the term includes all means for performing the function by reciting "virtual agent module disclosed in Fig[s]. 5-9 or 9:46-14:6." The Court finds Plaintiffs' construction fails to identify the specific steps the processor is programmed to perform and would be unhelpful to a jury. Moreover, Plaintiffs' construction is open ended and inconsistent with the well-established rule that, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Accordingly, the Court does not adopt Plaintiffs' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 5, the specification states that in Step A, "the production and

scheduling module operates according to a set of predetermined criteria to determine the ordering and scheduling of the system operation and job performance." '434 Patent at 18:35–39. Thus, the Court finds that in Step A, the processor is programmed to run jobs in order of a predetermined criteria. The specification further states that in Step B, "the Virtual Agent module retrieves the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records." '434 Patent at 10:23–25. Thus, the Court finds that in Step B the processor is programmed to retrieve the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records.

The specification further states that in Step C, "the Virtual Agent module retrieves or otherwise receives a set of client records from the client database." '434 Patent at 10:27–31. Thus, the Court finds that in Step C, the processor is programmed to retrieve or otherwise receive a set of client records from the client database. The specification further states that in Step D, "the module identifies, evaluates and analyzes the needs of the client among other reasons for plan(s) and product(s) selection of a given type." '434 Patent at 10:43–45. Plaintiffs argue that including plan(s) in the construction would be improper because the disputed phrase appears in claims that do not include "plans." The Court agrees and finds that in Step D the processor is programmed to identify, evaluate, and analyze the needs of the client.

The specification further states that in Step E, "the module analyzes the client information for that record, including demographic information." '434 Patent at 10:49–51. Thus, the Court finds that in Step E, the processor is programmed to analyze the client information for that record, including demographic information. The specification further states that in Step F, "the module uses the analyzed client information and applies it against the decision making criteria." '434 Patent at 10:52–54. Thus, the Court finds that in Step F, the processor is

programmed to use the analyzed client information and apply it against the decision making criteria.

Regarding Step G, the specification states that "the module selects the product or products which satisfy the decision making criteria being employed in the module." '434 Patent at 12:20–23. The specification also states that "[u]nder this Step G, the Virtual Agent™ module draws from the available product pool the most appropriate product to fit each plan selected as a candidate in Step F." '434 Patent at 12:23–25. However, as discussed above, including plan(s) in the construction would be improper because the disputed phrase appears in claims that do not include "plans." Accordingly, the Court finds that in Step G, the processor is programmed to select the product or products which satisfy the decision making criteria being employed. The specification further states that in Step H, "the module selects a specific amount or amounts of coverage to propose under each plan. This decision is based on the information as compile in Step D, E, F, and G as described above." '434 Patent at 13:48-52. Thus, the Court finds that in Step H, the processor is programmed to select a specific amount or amounts of coverage to propose based on the information as compiled in Step D, E, F, and G as described above.

Finally, the specification states that in Step I, "the module analyzes the past or current performance on a real-time basis of various sale programs." '434 Patent at 12:54–57. The specification further states that "[the module] identifies on a real-time basis who is buying on any geographic or any demographic basis. This step involves determining what the individual client is most likely to buy, making the end users aware of that fact, recommending changes, and if given permission, or if appropriately coded, automatically implementing the changes, which may occur even during the running of the module." '434 Patent at 12:57–64. The Court finds that the later portion of the specification's description of Step I is a preferred embodiment, and is

not clearly linked to the function recited in the claims. Similarly, the Court's construction captures the recited steps that are clearly linked to the function recited in the claim for the embodiments illustrated in Figures 6–9. Thus, the Court finds that in Step I, the processor is programmed to analyze the past or current performance on a real-time basis of various sale programs.

Plaintiffs argue that Steps H and I should not be included in the corresponding structure because they are a preferred embodiment. The Court disagrees. The claimed function generally recites selecting a financial product for each client appropriate for that client. The Court finds Steps H and I are clearly linked to performing this function because they select the specific amount and analyze performance. Accordingly, the Court finds that a person of ordinary skill in the art would understand that selecting an amount and analyzing performance are clearly linked to selecting a financial product appropriate for that client.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means . . . for using"** as follows:

**Function:** **The Court finds that the function is using the client information, [the life insurance products information]/[the financial products information including the non-price product information]/[the financial products information, the plans], and the decision criteria to select a subset of the [life insurance products]/[financial products]/[plans] for each of the clients appropriate for that client[, the subset of the plans including at least one plan comprising a plurality of the financial products].**

**Corresponding Structure:** **The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) run jobs in order of a predetermined**

criteria; **(B) retrieve the set of analysis instructions and decision making criteria to be used in processing the retrieved set of client records; (C) retrieve or otherwise receive a set of client records from the client database; (D) identify, evaluate and analyze the needs of the client; (E) analyze the client information for that record, including demographic information; (F) use the analyzed client information and apply it against the decision making criteria; (G) select the product or products which satisfy the decision making criteria being employed; (H) select a specific amount or amounts of coverage to propose based on the information as compiled in Step D, E, F, and G as described above; (I) analyze the past or current performance on a real-time basis of various sale programs.**

**12. "means for selecting the subset of life insurance products to include the life insurance products having the differing face value amounts"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for selecting the subset of life insurance products to include the life insurance products having the differing face value amounts" <br><br> '434 Patent claim 14 | **Function:** "means for selecting the subset of life insurance products to include the life insurance products having the differing face value amounts": selecting the subset of life insurance products to include the life insurance products having the differing face value amounts b. "means for selecting from among a plurality of consumer entities": selecting from among a plurality of consumer entities **Structure:** See above, structure identified for "means . . . for using" | **Function:** AGREED <br> **Structure:** See above, structure identified for "means . . . for using" |

a)  **The Parties' Positions**

The parties agree on the claimed function. Plaintiffs contend that their proposed construction is supported by the record for the reasons discussed above in the context of

"means . . . for using." (Dkt. No. 385 at 30.) Defendants argue that "means for selecting" is appropriately limited to the specific algorithm disclosed in Figures 5–9 of the '434 Patent, including at least Steps A–I, depicted in Figure 5. (Dkt. No. 411 at 37-38.)

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as "selecting the subset of life insurance products to include the life insurance products having the differing face value amounts." The Court agrees that this is the function recited in the claim. For the corresponding structure, the parties do not present any new arguments, but instead refer the Court to their respective construction for the "means . . . for using" phrase. Accordingly, for the reasons stated above the Court finds that corresponding structure is the same as for the previous phrase.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for selecting the subset of life insurance products to include the life insurance products having the differing face value amounts"** as follows:

**Function**: **The Court finds that the function is selecting the subset of life insurance products to include the life insurance products having the differing face value amounts.**

**Corresponding Structure**: **See above, structure identified for "means . . . for using."**

**13. "means for selecting from among a plurality of consumer entities those" consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign"<br><br>'938 Patent claim 312 | **Function:** selecting from among a plurality of consumer entities **Structure:** See above, structure identified for "means . . . for using" | **Function:** selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign<br>**Structure:** Indefinite |

### a) The Parties' Positions

The parties dispute whether the phrase is indefinite in view of the prosecution history. The parties appear to agree that the recited function is "selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign." Defendants' contend that the '938 Patent specification does not disclose any structure sufficient to perform the claimed function. (Dkt. No. 411 at 38.) Defendants argue that Plaintiffs point to the same structure as another term reciting different functionality and provide no substantive analysis of this term. (*Id.*)

Defendants argue that the claimed function for "means for selecting from among a plurality of consumer entities" is the kind of "product-centered marketing paradigm"

functionality that the patentee explicitly stated was not covered by the claimed invention during prosecution. (*Id*.) (citing Dkt. No. 411-28 at 8-12 ('072 Patent Reexam. FH, June 12, 2009, Examiner Interview Summary); (Dkt. No. 411-29 at 8 ('072 Patent Reexam. FH, July 20, 2009, Response); Dkt. No. 411-12 at 11, 15 ('434 Patent Reexam. FH, August 18, 2008, Response)). According to Defendants, corresponding structure to a function explicitly disclaimed during prosecution is therefore not disclosed at all. (*Id*. at 39.) Defendants further argue that the agreed function for the "means for selecting among a plurality of consumer entities" is the opposite of the function for the other "means . . . for using" and "means for selecting" terms, which require the selection of products for each consumer. (*Id*.)

Plaintiffs respond that Figures 7 and 8 of the '938 Patent provide a flow chart wherein step C of the processor module "retrieves next client/client record from database/client database." (Dkt. No. 419 at 9) (citing '938 Patent at 16:28). Plaintiffs further argue that the specification discloses that "processor module flow at block C retrieves the information, in this case a client record (client information)," uses "database query commands based upon the client database fields," and "may undertake some pre-sorting or other manipulation of the client information." (*Id*. at 10) (quoting '938 Patent at 18:31–54).

Plaintiffs also argue that the prior art was distinguished on the grounds that the claims "select and/or design the appropriate product for th[e] customer." (*Id*.) Plaintiffs contend that this is not a clear and unambiguous disclaimer that the claims may not also select clients suitable for a particular product. (*Id*.) Plaintiffs argue that the specification expressly discloses selecting the client so that "insurance solicitation communications are sent to mortgagee clients," and to identify the "classes of clients for whom [a] product is available (e.g., 'issue constraints' as used in the insurance industry) . . . ." (*Id*.) (citing '938 Patent at 12:23–26, 12:40–44).

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as "selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign." The Court agrees that this is the function recited in the claims.

Turning to the corresponding structure, the Court finds that it is a special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "Virtual Agent module." ('434 Pat. at 6:10–11, 7:14–25). Furthermore, the specification states that "FIG. 5 is a flow chart diagram illustrating the Virtual Agent™ module of the preferred embodiment and method of the invention." '434 Patent at 5:4–6. The specification also states that Figures 6–9 provide additional "specific examples" of the implementation of the algorithm disclosed in Figure 5. '434 Patent at 7:7–23. Accordingly, the Court finds that the corresponding structure is the same as the "means for using" phrase.

Regarding the prosecution disclaimer argument, Defendants are correct that the patentee made the following arguments in distinguishing the prior art:

> The claims are not merely variations or combinations of the elements found in these references, but represent a paradigm shift in the technology for marketing to customers. Holtman, Nash, Lawlor, and Melchione describe methods and apparatuses in the marketing paradigm of *product-centered marketing*, that is, starting with a pre-existing standard product and culling a list of customers until the "right" customers are left on the list. This process is repeated for each pre-existing standard product that a company wants to market.
> The instant specification discloses, and *the present claims exist in, a vastly*

*different marketing paradigm*; *one that employs methods and apparatuses that start with a customer and select and/or design the appropriate product for that customer.* The references cited in the Office Action, as well as the references submitted in the Reexamination Request, disclose techniques and elements that are dysfunctional in this paradigm.

Dkt 411-12 at 15 (434 Pat. Reexam. FH, Aug. 18, 2008, Response) (emphasis added). However, the recited function is broader than the scenario discussed in the prosecution history. For example, the recited function does not require and is not limited to "a pre-existing standard product and culling a list of customers until the 'right' customers are left on the list," as argued by the applicant during the reexamination. Instead, the recited function is "selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign." In other words, the corresponding structure is exactly what is disclosed in Figure 5.

To the extent that Plaintiffs contend that the recited function and corresponding structure can include "a pre-existing standard product and culling a list of customers until the 'right' customers are left on the list," the Court rejects this argument because it was expressly disclaimed during the reexamination. Indeed, this would be the "vastly different marketing paradigm" that the applicant distinguished during the reexamination.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of financial product or service offering being offered as part of a mass marketing campaign"** as follows:

**<u>Function</u>: The Court finds that the function is selecting from among a plurality of consumer entities those consumer entities suitable for receiving a particular type of**

**financial product or service offering being offered as part of a mass marketing campaign.**

**Corresponding Structure:** See above, structure identified for "means . . . for using."

### 14. "means for automatically determining and gathering"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for automatically determining and gathering"<br><br>'434 Patent claim 21 | **Function:** automatically determining and gathering the client information required for the respective client records based on analyzing the information about the financial products<br>**Structure:** network server processor specifically programmed to implement the data input module disclosed in Fig. 4, or 7:33–8:63, and equivalents thereof | **Function:** automatically determining and gathering the client information required for the respective client records based on analyzing the information about the financial products<br>**Structure:** The hardware is a general purpose computer depicted in Figure 1, as Network server 10, but the software implementation is not disclosed by the specification. The specification does not describe network server 10 in any manner beyond a general purpose computer and fails to include sufficient algorithm for performing the claimed function, and therefore this term is indefinite. |

#### a) The Parties' Positions

The parties agree on the claimed function for the term "means for automatically determining and gathering," but disagree on whether sufficient structure to perform the claimed function is disclosed. Plaintiffs contend that the claim language itself indicates that the "means for inputting includes means for automatically determining and gathering . . . ." (Dkt. No. 385 at 31.) Plaintiffs argue that this means that the claimed function is performed by the same structure that implements the data input module. (*Id.*) Plaintiffs contend that the specification clearly links the specially programmed processor implementing the "data input module" with the claimed function. (*Id.*) (citing '434 Patent at 8:27–37; 7:33–8:63, 10:16–20, Figure 4.)

Defendants respond that Plaintiffs' identification of Figure 4 and over 1-1/2 columns of the specification does not disclose any algorithm that would perform the claimed function. (Dkt.

No. 411 at 40.) Defendants argue that at most, the specification repeats the functional language and does not contain any step-by-step process for the agreed function. (*Id*.) Defendants further contend that the terms "determining," "determine," and "determination" do not appear in the specification. (*Id*.)

Plaintiffs reply that the specification discloses that "the system will receive or gather on its own . . . client information . . . . For a given potential client, the system is adapted to retrieve client information . . . ."" (*Id*.) (quoting '434 Patent at 8:29–34). Plaintiffs further argue that the term is not indefinite simply because the specification does not use the word "determining." (*Id*.) According to Plaintiffs, a person of ordinary skill would understand from the reference to "the type of data to be inputted" that the relevant fields are determined. (*Id*.)

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as "automatically determining and gathering the client information required for the respective client records based on analyzing the information about the financial products" The Court agrees that this is the function recited in the claims. The Court further finds that the disputed phrase is a sub-function of the "means for inputting." Specifically, claim 21 recites "wherein said means for inputting includes means for automatically determining and gather." Accordingly, the claim language indicates that the corresponding structure for the function of "automatically determining and gathering the client information" will include, at least in part, the structure for the function of "inputting the client information."

As discussed above, the prosecution history requires the client information to be "automatically" inputted, and the function in dispute is "automatically determining and

generating." Thus, for the reasons discussed with regard to the "means for inputting" phrase, the

Court finds that the structure includes a processor and, therefore, should also include the

algorithm of Figure 4 in the structure. Specifically, the specification states that "[a]n example of

the organization and task flow of the data input module shown in FIG. 4." '434 Patent at 8:9–10.

The specification further states the following:

> The data input module of this embodiment and method inputs data into the
> system from one or more of the input devices for the system, such as modem 20,
> tape drive 22, or bar code reader 24.
> With further reference to FIG. 4, as data is inputted [sic], the data input
> module stores it in a temporary storage area within processor 12. If necessary or
> appropriate, the data is converted to a format compatible with the system. For
> example, as is known in the database arts, it is sometimes necessary to import or
> export files to convert one database format to a pre-defined database structure. In
> this embodiment, the data input module also may tag and identify client records as
> they are inputted, and perform general and routine "house keeping" tasks on the
> data. Once these tasks have been performed by the data input module, the
> properly-formatted client information is transferred to the database module.

'434 Patent at 8:38–61. As indicated above, the specification includes a processor in the

structure of the inputting means, and further discloses the algorithm that performs the function in

Figure 4. However, unlike the "means for inputting" phrase, the Court finds that the algorithm

related to the "means for automatically determining and generating" requires performing the

additional steps disclosed, but not required for the function of inputting the client information.

Specifically, to perform the function of "automatically determining and generating," the

processor is further programmed to perform the steps of: (1) converting data to compatible

format for the system; and (2) tagging and identifying client records.

The specification indicates that the function of "automatically determining and

generating" requires identifying "client records as they are inputted, and performing general and

routine 'house keeping' tasks on the data." '434 Patent 8:58–59. This is consistent with the

specifications statement that the data input module "will receive or gather on its own essentially

the same client information that would be made available to an agent." '434 Patent at 8:27–37. This would include performing the disclosed tagging and converting data to compatible format for the system.

As with the phrase "means for inputting," the Court finds that the corresponding structure includes a modem, tape drive, diskette, non-resident database, and equivalents thereof, in conjunction with the processor programmed to perform the steps identified above. The specification identifies a processor in Figure 1 programmed to perform the related steps of Figure 4. Referring to Figure 1, the specification identifies the following media structure for inputting information:

> The means of inputting may vary depending on the format in which the information is available. With reference to FIG. 1, for example, information may be directly entered using keyboard 16. Diskette drives (not shown), for example, as would come as standard equipment with the types of processors noted above also may be used. In some instances, bulk lists of client records may be available by tape, in which case in which case tape drive 22 may be used. Some records are available on non-resident databases. This is increasingly the case as online networks such as the Internet gain widespread use and acceptance. In such instances, prospective client information may be received via modem 20.

'434 Patent at 7:58-8:3. Likewise, the corresponding media structure is identified in Figure 4, which states that the media formats include "Modem Transfer, Tape, and Diskette, Etc." '434 Patent at Figure 4 ("Download Data" block). Thus, the Court finds that the structure includes at least these elements.

Furthermore, the analysis of the arguments made during the first reexamination for the phrase "means for inputting" apply equally here. During reexamination, the applicant argued that the "means for inputting the client information" element must include this structure because a simple keyboard entry system was not enough. (Dkt. 411-25 at 13 (Feb. 21, 2006 OA Response)). Likewise, the PTO relied on the applicant's argument of automatic input of the client information without human intervention in allowing the claims. (Dkt 411-26 at 6 ('434

Patent 1st Reexam. FH, Apr. 3, 2007, Reasons for Allowance)). Accordingly, the Court finds that the corresponding structure is the identified media operating in conjunction with a processor programmed to perform the related steps identified in Figure 4.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for automatically determining and gathering"** as follows:

**<u>Function</u>: The Court finds that the function is automatically determining and gathering the client information required for the respective client records based on analyzing the information about the financial products.**

**<u>Corresponding Structure</u>: The Court finds that the corresponding structure is modem, tape drive, disk drive, diskette drive, non-resident database, and equivalents thereof, in conjunction with a processor programmed to perform the additional steps of: (1) converting data to compatible format for the system; and (2) tagging and identifying client records.**

**15. "means for preparing" / "means for automatically generating" /"means for automatically preparing" / "means for automatically generating and communicating"**

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for preparing a client communication . . ." <br><br> '434 Patent claims 1, 14, 21, 22, 28 | **Function:** preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client <br> **Structure:** network server processor specifically programmed to implement sales presentation and output module disclosed in Figure 10, or 14:7–18:7, and equivalents thereof | **Function:** AGREED <br> **Structure:** The general purpose computer depicted in Figure 1, as Network server 10 and "output devices such as laser printers" executing the specific algorithm disclosed in Figure 10 of the '434 Patent (Figure 13 of the '184 and '938 Patents). The algorithm includes at least Steps A–E, disclosed in Figure 10 of the '434 Patent (Figure 13 of the '184 and '938 Patents): A. Retrieve work to be performed from other parts of the system, which includes retrieving instructions which would be used in preparing the presentation letter or other communications output. B. Group client files by user, or by the sales program to be use, or by other criteria specified by the system user. C. Receive client record for processing. D. Analyze and evaluate client information from the client record, the corresponding output for that client record, and other data or information needed to construct the communication. E. Use the instructions for preparation of the communication, together with data and information from Step D, to prepare the presentation or other communication |
| "means for automatically preparing mass marketing communications . . ." <br><br> '938 Patent claim 312 | **Function:** automatically preparing mass marketing communications comprising offerings for said particular type of financial product or service or variant thereof to said selected consumer entity <br> **Structure:** Same | **Function:** AGREED <br> **Structure:** Same |

| | | |
|---|---|---|
| "means for automatically generating communication data outputs for a plurality of clients"<br><br>'184 Patent claim 37 | **Function:** automatically generating communication data outputs for a plurality of clients<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Same |
| "means for automatically generating one or more responsive communication data outputs containing data obtained from the one or more databases"<br><br>'184 Patent claim 37 | **Function:** automatically generating one or more responsive communication data outputs containing data obtained from the one or more databases<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Indefinite |
| "means for automatically generating replies to at least some of the responses"<br><br>'938 Patent claim 312 | **Function:** automatically generating replies to at least some of the responses<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Indefinite |

### a) The Parties' Positions

The parties agree on the function of these terms, but dispute the corresponding structure and the scope of the algorithm that is linked to the claimed function. Plaintiffs propose a "network server processor" as opposed to Defendants' proposal of a "general purpose computer." Plaintiffs contend that the specification clearly links the sales presentation and output module, an example of which is disclosed in Figure 10, to the claimed functions. (Dkt. No. 385 at 33) (citing '434 Patent at 14:7–18:7, Figures 1-3, 10). Plaintiffs argue that Defendants propose construing the phrases by specific reference to Figure 10, and add the further limitation that the structure "at least" include Steps A–E. (*Id.*) Plaintiffs contend that Defendants' proposal fails to account for the entire structure disclosed. (*Id.*) Plaintiffs argue that Defendants' characterization

of Step A fails to account for the specification's broader disclosure that Step A "retrieves work to be performed from other parts of the system." (*Id.*) (citing '434 Patent at Fig. 10). According to Plaintiffs, Defendants' proposed structure therefore is overly limiting. (*Id.*)

Defendants respond that their construction reflects the only complete algorithm for performing the agreed functions, which includes the algorithm disclosed in Figure 10 of the '434 Patent and an additional required component of Step A of that algorithm. (Dkt. No. 411 at 42.) Defendants argue that the specification clearly identifies these additional required components by stating that "[a]s part of Step A, the output module retrieves instructions which would be used in preparing the presentation letter or other communications output." (*Id.*) (quoting '434 Patent at 15:14–16). Defendants contend that these additional requirements have been included in Defendants' construction and do not limit broader disclosures in the specification, as alleged by Plaintiffs. (*Id.*) Defendants further argue that Plaintiffs' citation to the "'434 Patent at 14:7–18:7" as the corresponding structure is improper, incorrect, and misleading. (*Id.*)

Defendants also contend that the algorithm described in Figure 10 does not account for generation of replies to a response or subsequent responses. (*Id.* at 43.) According to Defendants, Figure 10 relates only to the output module for the initial client communication presentation. (*Id.* at 43.) Defendants also argue that the algorithm for receiving responses (e.g., that shown in Figure 12 of the '434 Patent), also does not indicate that any such responses are fed back into the algorithm shown in Figure 10. (*Id.* at 43.) Defendants further argue that even if Figure 10 did disclose an algorithm sufficient for performing the functions, such an algorithm is not clearly linked to the functions in the specification, and thus is indefinite for this reason. (*Id.* at 43.)

Plaintiffs reply that Defendants fail to include the full disclosed structure. (Dkt. No. 419 at 11.) Plaintiffs argue the only output device proposed by Defendants is "laser printers," but

figure 10 discloses output by means of "printed materials, modem or electronic transfer, internet, voice response, etc." (*Id*.) ('434 Patent at Fig. 10). Plaintiffs further argue that Defendants' construction is limited to "receiv[ing] client record for processing, whereas Figure 10 discloses that the client record may be "retrieve[d]." (*Id*.) (citing '434 Patent at Fig. 10).

Plaintiffs further argue that Defendants have failed to show that the terms are indefinite. (*Id*.) Plaintiffs contend that Defendants fail to account for Figures 18 and 19 of the '938 and '184 Patents, which disclose "a flow chart of a reply system of the invention" and "reply generation system," and the detailed disclosure of the "automatic reply system module" in the specifications. (*Id*.) (citing '938 Patent at 30:55-34:34, Figures 18–19). Plaintiffs argue that Defendants bear the heavy burden on this issue and their failure to consider the full specification is fatal. (*Id*.)

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that these are the functions recited in the claims. Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "output module." '434 Patent at 6:10–11, 7:14–25. Furthermore, the specification states that "FIG. 10 is a flow chart diagram illustrating the output module of the preferred embodiment and method of the invention." '434 Patent at 15:4–6. The specification of

the '184 Patent also states that Figure 18 is a flow chart diagram of the automatic reply system module. '184 Patent at 30:11–17. Accordingly, the Court turns to these flow charts to determine the steps the processor is programmed to perform.

As an initial matter, Plaintiffs propose "network server processor specifically programmed to implement sales presentation and output module disclosed in Figure 10, or 14:7–18:7, and equivalents thereof." The Court finds Plaintiffs' construction fails to identify the specific steps the processor is programmed to perform and would be unhelpful to a jury. Moreover, Plaintiffs' construction is open ended and inconsistent with the well-established rule that, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). Accordingly, the Court does not adopt Plaintiffs' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 10 of the '434 Patent, the specification states that in Step A, "the output module retrieves work to be performed from other parts of the system." '434 Patent at 15:6–8. The specification further states that "[a]s part of Step A, the output module retrieves instructions which would be used in preparing the presentation letter or other communications output." '434 Patent at 15:14–16. Plaintiffs argue that this description is overly limiting. The Court disagrees. The patentees invoked means-plus-function claiming and 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure    described in the specification and equivalents thereof.'" *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (citing 35 U.S.C. § 112, ¶ 6). Accordingly, the Court finds that in Step A the processor is programmed to retrieve work to be performed from

other parts of the system, that includes retrieving instructions which would be used in preparing the presentation letter or other communications output.

The specification further states that in Step B, "client files are grouped by user, or by the sales program to be used, or by other criteria specified by the system user." '434 Patent at 15:23–25. Thus, the Court finds that in Step B, the processor is programmed to group client files by user, or by the sales program to be use, or by other criteria specified by the system user. The specification further states that in Step C, "the output module receives a client record for processing" '434 Patent at 15:33–34. Thus, the Court finds that in Step C, the processor is programmed to receive client record for processing. In addition, Step C illustrated in Figure 10 states "Retrieves Next Client Record." '434 Patent at Figure 10. Thus, the Court finds that in Step C, the processor is programmed to retrieve or otherwise receive client record for processing.

The specification further states that in Step D, "the output module analyzes and evaluates the client information from the client record, the corresponding output from the Virtual Agent module for that client record, and other data or information needed to construct the communication." '434 Patent at 15:33–38. Thus, the Court finds that in Step D, the processor is programmed to analyze and evaluate client information from the client record, the corresponding output for that client record, and other data or information needed to construct the communication.

Finally, the specification states that in Step E, "the output module uses the instructions for preparation of the communication, together with the data and information from Step D, to prepare the presentation or other communication." '434 Patent at 15:40-45. Thus, the Court finds that in Step E, the processor is programmed to use the instructions for preparation of the

communication, together with data and information from Step D, to prepare the presentation or other communication. Figure 10 also clearly indicates that the processor works in conjunction with output devices, such as printers, modem, display, and voice recognition technology. '434 Patent at 6:7–9, 8:21–26, Figure 10, Step H.

Regarding the phrases that Defendants claim are indefinite, the Court finds that Figures 18 and 19 of the '938 and '184 Patents disclose the corresponding structure. Specifically, the specification states the following:

> The invention provides a system that includes software that automatically generates a reply to responses received from clients responding to a mass communication. The invention may better be understood with reference to FIG. 18, a flow diagram illustrating a preferred embodiment of the invention. In this particular non-limiting illustrative embodiment, an initial mass communication is mailed to a plurality of clients (up to tens or hundreds of thousands, or even millions) in step 1000. The mass communication elicits client responses 1010, and these are (preferably electronically) read into a logic system 1020 through an appropriate input device. The logic system 1020 reviews the client response, analyzes the response 1030 and then determines whether a reply letter must be generated 1040. For example, if the client response relates to a solicitation for life insurance, in which several different options were presented, and the client requests further information on either one of the options, or requests an additional quotation, then the system logic 1020 and 1030 recognizes the client response. If the client requires an additional quotation, for example, an additional letter to the client will be needed. If no communication is needed, for example if the client has made a "purchase response", then the response is routed out of the system to step 1060 where the purchase is further processed and a "thank you" letter or additional follow up is generated, as needed. On the other hand, if it is determined from the response that the client requires additional information, an appropriate letter is generated addressing the specific client's requirements. This letter is then delivered to the client 1050, by any one of a variety of means, which could be specified by the client. It is important to note that the system processes responses and automatically (preferably electronically) generates a plurality (thousands, hundreds of thousands, or millions) of replies, each directed specifically to a response from a particular client.

> Referring back to FIG. 18, the system tests whether a client has responded to a prior delivered reply in 1070. If the client has responded, the client response is again input and analyzed as discussed above. If the client has not responded, a determination is made as to whether a follow-up is needed 1080. If a follow-up is not required, the communication with the particular client is terminated. On the

> other hand, if a follow-up is required, the communication is processed through follow-up logic 1090 which generates a follow-up letter that is delivered 1110 to the client by any one of a variety of appropriate means. Once the follow-up letter is delivered, the system retains information in memory, and tests at a later date whether the client has responded 1070. If there has been no response, the system determines whether a follow-up is needed 1080.

'184 Patent at 30:11-31:3. Accordingly, the Court finds the processor is programmed to (1) receive a client response; (2) review and analyze the response; (3) determine whether a reply is needed; (4) generate a reply when it is determined that a reply is needed.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for preparing a client communication . . . "** as follows:

**Function**: **The Court finds that the function is preparing a client communication for each of the clients which identifies the subset of the [life insurance products / financial products / plans] for that client.**

**Corresponding Structure**: **The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) retrieve work to be performed from other parts of the system, which includes retrieving instructions which would be used in preparing the presentation letter or other communications output; (B) group client files by user, or by the sales program to be used, or by other criteria specified by the system user; (C) retrieve or otherwise receive client record for processing; (D) analyze and evaluate client information from the client record, the corresponding output for that client record, and other data or information needed to construct the communication; and (E) use the instructions for preparation of the communication, together with data and information from Step D, to prepare the presentation or other communication.**

The Court construes the phrase **"means for automatically preparing mass marketing**

**communications . . .** " as follows:

**Function**: **The Court finds that the function is automatically preparing mass marketing communications comprising offerings for said particular type of financial product or service or variant thereof to said selected consumer entity.**

**Corresponding Structure**: **The Court finds that the corresponding structure is the same as above.**

The Court construes the phrase **"means for automatically generating communication data outputs for a plurality of clients"** as follows:

**Function**: **The Court finds that the function is automatically generating communication data outputs for a plurality of clients.**

**Corresponding Structure**: **Same as above, except change "communication" to "communication data outputs."**

The Court construes the phrase **"means for automatically generating one or more responsive communication data outputs containing data obtained from the one or more databases"** as follows:

**Function**: **The Court finds that the function is automatically generating one or more responsive communication data outputs containing data obtained from the one or more databases.**

**Corresponding Structure**: **a processor programmed to perform the steps of: (1) receive a client response; (2) review and analyze the response; (3) determine whether a responsive communication data output is needed; (4) generate a responsive communication data output when it is determined that one is needed.**

The Court construes the phrase **"means for automatically generating replies to at least**

**some of the responses"** as follows:

**Function: The Court finds that the function is automatically generating replies to at least some of the responses.**

**Corresponding Structure: a processor programmed to perform the steps of: (1) receive a client response; (2) review and analyze the response; (3) determine whether a reply is needed; (4) generate a reply when it is determined that one is needed.**

### 16. "means for sending" / "means for communicating" / "means for delivering"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for sending one component of the communication data outputs to at least certain of the plurality of clients"<br><br>'184 Patent claim 37 | **Function:** sending one component of the communication data outputs to at least certain of the plurality of clients<br>**Structure:** network server processor specifically programmed to implement at least the algorithm of Figure 13, Step H, and equivalents thereof | **Function:** AGREED<br>**Structure:** the general purpose computer depicted in Figure 1, as Network server 10, programmed to implement the specific algorithm disclosed in Figure 13, Step H |
| "means for communicating said communications to said selected consumer entities"<br><br>'938 Patent claim 312 | **Function:** means for communicating said communications to said selected consumer entities<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Same |
| "means for communicating said replies to associated consumer entities"<br><br>'938 Patent claim 312 | **Function:** communicating said replies to associated consumer entities<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Indefinite |

| "means for delivering the responsive communication data outputs to the certain clients"<br><br>'184 Patent claim 37 | **Function:** delivering the responsive communication data outputs to the certain clients<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Indefinite |
| --- | --- | --- |

### a) The Parties' Positions

The parties agree on the claimed functions, but disagree on the corresponding structure. Plaintiffs contend that the specification clearly links step H of Figure 13 with the sending/communicating/delivering function. (Dkt. No. 385 at 35.) Plaintiffs argue that the step is described as the "output module" "present[ing] [the] output" by "printed materials, modem or electronic transfer, internet, voice response, etc." (*Id.*) (citing '938 Patent at Fig. 13). Plaintiffs argue that the specification further clearly links the disclosure of means for delivery, including "mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically," and "human operator and voice recognition and response technology." (*Id.* at 36) (citing '938 Patent at 44:1–4, 45:17–21, 3:45–51, 25:15–28:37, Figures 4, 13).

Defendants respond that they modified their proposed structure to reference the algorithm disclosed in Step H of Figure 13, which corresponds to the same step identified by Plaintiffs. (Dkt. No. 411 at 46.) Defendants argue that the remaining dispute regarding the proper construction relates to the use of the general purpose computer. (*Id.*) Regarding the phrases that Defendants contend are indefinite, Defendants argue that given that the means for preparation of replies is indefinite, it follows that communication of such replies is also indefinite for similar reasons. (*Id.* at 47.) Defendants argue that the specification again merely provides functional description, but no algorithm for these terms. (*Id.*) Defendants further argue that nothing in Plaintiffs' cited Figure 13 describes an algorithm for communicating replies to responses. (*Id.*)

Defendants contend that the specification is devoid of any such algorithm. (*Id.*)

Plaintiffs respond that Defendants have failed to carry their heavy burden of showing that the "means for communicating said replies" and "means for delivering the responsive communication data outputs" are indefinite. (Dkt. No. 419 at 11.) Plaintiffs further argue that a person of ordinary skill would not consider the means for communicating and delivering unclear, especially where the specification discloses that replies may be "delivered to the client 1050, by any one of a variety of means," and system outputs are broadly disclosed as including "printed materials, modem or electronic transfer, internet, voice response, etc." (*Id.*) ('938 Patent at 31:17-18, Figure 13).

### b) **Analysis**

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that these are the functions recited in the claims. Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes a "core" system, which further includes the "output module." '938 Patent at 8:25–27, 9:61–64. Furthermore, the specification states that "FIG. 13 is a flow chart diagram illustrating the output module of the preferred embodiment and method of the invention." '938 Patent at 25:16–18. The specification also states that Figure 18 is a flow chart diagram of the automatic reply system module. '938 Patent at 30:58–61. Accordingly, the Court turns to these flow charts to determine the steps the

processor is programmed to perform.

As an initial matter, the parties propose that the structure includes "the algorithm of Figure 13, Step H." The Court finds that the parties' construction fails to clarify what exactly Step H includes. Accordingly, the Court does not adopt the parties' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 13 of the '938 Patent, Step H is label "Presentation Output" and incudes blocks labeled "Printed Materials, Modem or Electronic Transfer, Internet, Voice Response, Etc." The specification further indicates that the communicating means may include "mail, internet, facsimile transmittal, hand, electrically, non-electronically, and telephonically," as well as "human operator and voice recognition and response technology." '938 Patent at 44:1–4, 45:17–21; 13:45–51, Figures 4, 13. The parties do not dispute that this includes the recited structure. Accordingly, the Court finds that the corresponding structure is printer, modem, display, internet, electronic transfer, voice recognition technology, and equivalents thereof in conjunction with a processor programmed to perform the step of sending a responsive communication data output to a client.

Regarding the phrases that Defendants claim are indefinite, the Court finds that Figures 18 and 19 of the '938 and '184 Patents disclose the corresponding structure. Specifically, the specification states that the "letter is then delivered to the client 1050, by any one of a variety of means, which could be specified by the client. It is important to note that the system processes responses and automatically (preferably electronically) generates a plurality (thousands, hundreds of thousands, or millions) of replies, each directed specifically to a response from a particular client. '184 Patent at 30:39-45. Accordingly, the Court finds the processor is programmed to deliver a reply or response.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for sending one component of the communication data outputs to at least certain of the plurality of clients"** as follows:

**<u>Function</u>**: The Court finds that the function is sending one component of the communication data outputs to at least certain of the plurality of clients.

**<u>Corresponding Structure</u>**: The Court finds that the corresponding structure is a printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending communication data output to a client.

The Court construes the phrase **"means for communicating said communications to said selected consumer entities"** as follows:

**<u>Function</u>**: The Court finds that the function communicating said communications to said selected consumer entities.

**<u>Corresponding Structure</u>**: The Court finds that the corresponding structure is printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending communications to a consumer entity.

The Court construes the phrase **"means for communicating said replies to associated consumer entities"** as follows:

**<u>Function</u>**: The Court finds that the function is communicating said replies to associated consumer entities.

**<u>Corresponding Structure</u>**: The Court finds that the corresponding structure is

printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending a reply to a consumer entity.

The Court construes the phrase **"means for delivering the responsive communication data outputs to the certain clients"** as follows:

<u>**Function**</u>: The Court finds that the function is delivering the responsive communication data outputs to the certain clients.

<u>**Corresponding Structure**</u>: The Court finds that the corresponding structure is printer, modem, display, voice recognition technology, internet, electronic transfer, and equivalents thereof, in conjunction with a processor programmed to perform the step of sending a responsive communication data output to a client.

### 17. "means for receiving"

| Disputed Term | Plaintiffs' Proposal | Defendants' Proposal |
|---|---|---|
| "means for receiving responses to said communications from at least some of said consumer entities"<br><br>'938 Patent claim 312 | **Function:** receiving responses to said communications from at least some of said consumer entities<br>**Structure:** network server processor specifically programmed to implement at least the algorithm of Fig. 15, steps A-C, and equivalents thereof | **Function:** AGREED<br>**Structure:** The general purpose computer depicted in Figure 1, as Network server 10 executing the specific algorithm disclosed in Fig. 15. The algorithm includes at least steps A-C: A. Receive the response. Responses can be received by a variety of transmission methods, e.g., electronically from call centers, users of the system, faxes, internet, etc. B. Input response into the system, manually, by scanning, or by other methods described above which regard to the data input module. C. Store responses and organize data in a sales database. |

| "means for receiving one or more responsive communications from the certain clients to the offerings"<br><br>'184 Patent claim 37 | **Function:** receiving one or more responsive communications from the certain clients to the offerings<br>**Structure:** Same | **Function:** AGREED<br>**Structure:** Same |

### a) The Parties' Positions

The parties agree on the claimed functions, and largely agree on the disclosed corresponding structure. The parties dispute whether the disclosed structure should be a "network server processor," as Plaintiffs propose, or if it should include a "general purpose computer," as Defendants propose. Plaintiffs contend that the specification clearly links at least steps A–C of Figure 15 to the claimed function. (Dkt. No. 385 at 36) (citing '938 Patent at 29:19–30:14, 30:55–31:49, Figures 2, 15, 18, & 20–21). Defendants respond that their proposal of a "general purpose computer . . . executing the specific algorithm" is justified for the reasons stated above with regard to the "means for using" phrase. (Dkt. No. 411 at 48.)

### b) Analysis

Having reviewed the claims, the Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. The parties have identified the recited function as indicated in the table above. The Court agrees that these are the functions recited in the claims. Turning to the corresponding structure, the Court finds that it is not a general purpose computer, but rather the special purpose computer programmed to perform the disclosed algorithm. *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008). Specifically, the specification states that "[e]ach of the individual computer workstations or nodes within the system includes a processor 12," and that processor 12 has resident within it software that includes an "administrative and support" system. '184 Patent at 8:16–17, 9:42–43. The specification further states that the administrative and support system includes a "sales and financial report and analysis module."

'184 Patent at 9:49–51. The specification adds that "[a] flow chart which illustrates the organization and flow of the sales and financial report and analysis module for the preferred embodiment and method is shown in FIG. 15." '184 Patent at 28:51–53. Accordingly, the Court turns to this flow chart to determine the steps the processor is programmed to perform.

As an initial matter, Plaintiffs propose "network server processor specifically programmed to implement at least the algorithm of Fig. 15, steps A–C, and equivalents thereof." The Court finds Plaintiffs' construction fails to clarify what exactly steps A–C include. Accordingly, the Court does not adopt Plaintiffs' structure because it fails to identify the corresponding structure with the required specificity.

Referring to Figure 15 of the '184 Patent, the specification states that Step A "involves receiving sales information based on sales of financial products actually made," '184 Patent at 28:55–57. Thus, the Court finds that in Step A, the processor is programmed to receive a response. The specification further states that in Step B "these sales results are inputted into the system, manually, by scanning, or by other methods described above which regard to the data input module." '184 Patent at 28:57–60. Thus, the Court finds that in Step B, the processor is programmed input the response into the system, manually, by scanning, or by other methods described above which regard to the data input module. The specification further states that in Step C, "these results are stored and organized in a sales database resident in the database module." '184 Patent at 28:60–61. Thus, the Court finds that in Step C the processor is programmed to store responses and organize data in a database.

### c) Court's Construction

In light of the intrinsic evidence, the Court construes the phrase **"means for receiving responses to said communications from at least some of said consumer entities"** as follows:

**Function**: The Court finds that the function is receiving responses to said communications from at least some of said consumer entities.

**Corresponding Structure**: The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) receive a response; (B) input the response into the system, manually, by scanning, or by other methods described above which regard to the data input module; and (C) store responses and organize data in a database.

The Court construes the phrase **"means for receiving one or more responsive communications from the certain clients to the offerings"** as follows:

**Function**: The Court finds that the function is receiving one or more responsive communications from the certain clients to the offerings.

**Corresponding Structure**: The Court finds that the corresponding structure is a processor programmed to perform the steps of: (A) receive a response; (B) input the response into the system, manually, by scanning, or by other methods described above which regard to the data input module; and (C) store responses and organize data in a database.

## V.    CONCLUSION

The Court adopts the above constructions. The parties are ordered that they may not refer, directly or indirectly, to each other's claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**It is SO ORDERED.**

**SIGNED this 18th day of April, 2015.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE